Philip J. Kearney - 114978
    PKearney@mpbf.com
Christopher R. Ulrich - 271288
    CUlrich@mpbf.com
Kevin D. Cardona - 314033
    KCardona@mpbf.com
Alexandrea M. Tomp - 324022
    ATomp@mpbf.com
MURPHY, PEARSON, BRADLEY & FEENEY
580 California Street, Suite 1100
San Francisco, CA  94104-1001
Telephone:      (415) 788-1900
Facsimile:      (415) 393-8087

Attorneys for Plaintiff DAI TRANG THI NGUYEN

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| DAI TRANG THI NGUYEN, an individual, | Case No.: 5:21-cv-00092-EJD |
| Plaintiff, | **PLAINTIFF DAI TRANG THI NGUYEN'S OPPOSITION TO MOTION TO DISMISS CLAIMS** |
| v. | |
| CITY OF SAN JOSE; WILLIAM GERRY, an individual; and DOES 1-100, inclusive, | DATE:    June 3, 2021<br>TIME:    9:00 A.M.<br>PLACE:   San Jose, Ctrm 4, 5th Fl.<br>JUDGE:   The Hon. Edward J. Davila |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF COMPLAINT ........................................................................... 3

    A.    William Gerry & the City Code Enforcement Division ........................ 3

    B.    Gerry's Civil Rights Violations against Plaintiff ................................. 4

    C.    Gerry's Arrest and Other Victims. ....................................................... 5

    D.    The City's Unconstitutional Policies, Customs, or Practices. ............. 6

        1.    Gerry Acted Pursuant to an Express City Policy of Enhanced Massage Enforcement ...................................................................... 6

        2.    Gerry was the Final Policy Maker Regarding Massage Code Enforcement. .................................................................................. 7

        3.    Gerry Acted Pursuant to the City's Long-Standing Practice of Unsupervised Solo Massage Enforcement. .................................... 7

        4.    The City's Deliberate Indifference toward Hiring, Supervision, Discipline, and the Adoption of Policies to Prevent Constitutional Violations ................................................................. 7

        5.    The City had Actual Notice and Knowledge of Gerry's Unfitness ......... 10

        6.    The Discriminatory Enforcement of the Massage Ordinance against Asian Female Massage Business Owners and Masseuses. ..................... 11

    E.    Causes of Action ................................................................................ 11

III.    STANDARD OF REVIEW ............................................................................... 12

IV.    LEGAL ARGUMENT ....................................................................................... 12

    A.    Gerry's Rampant Sexual and Economic Misconduct Violated 42 U.S.C. § 1983. 12

    B.    Plaintiff Has Alleged Facts Sufficient to Hold The City Liable Under 42 U.S.C. § 1983. .............................................................................. 12

        1.    Municipal Liability Pursuant to *Monell*. ................................... 12

        2.    The City was Deliberately Indifferent in the Enforcement of its Massage Policies, Ordinances, and Regulations. ................................... 13

            a.    The City Failed to Effectively Supervise or Discipline Gerry ..... 15

            b.    The City Failed to Adopt Policies Necessary to Prevent Constitutional Violations ......................................................... 15

# TABLE OF CONTENTS
(continued)

**Page**

    c.    The City's Failure to Conduct a Background Check of Gerry Constituted Deliberate Indifference in his Hiring. ...................... 16

    3.    The City's Custom and Practice of Unsupervised Solo Male Code Enforcement Constituted Deliberate Indifference In Supervision and Discipline ............................................................................................. 16

    4.    Decisions of City Final Policy-Makers Caused the Constitutional Violations Suffered by Plaintiff. ............................................................ 17

    a.    The City's Chief Code Enforcement Official was a Final Policy Maker Regarding Massage Enforcement. .................................. 18

    b.    Gerry was a *De Facto* Policy Maker as the City's only Massage Code Enforcement Inspector ...................................................... 20

    c.    The City Council's Express Decision to Devote a Single Code Inspector to Enforce the Mandates of the Massage Ordinance on 5900 Entities and Practitioners Caused the Plaintiff's Constitutional Violations .......................................................... 22

    d.    City Policymakers Ratified Gerry's Unconstitutional Acts ......... 22

V.    CONCLUSION ............................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.C. v. City of Santa Clara*
2015 WL 5350412 *9 ................................................................................................. 13

*Anderson v. Warner*
451 F.3d 1063 (9th Cir. 2005)................................................................................... 13

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .................................................................................................. 12

*Bd. of County Com'rs of Bryan County, Okl. v. Brown*
520 U.S. 397 (1997) ................................................................................... 13, 16, 17

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................................................. 12

*Camreta v. Greene*
563 U.S. 692 (2011) .................................................................................................. 14

*City of Canton v. Harris*
489 U.S. 378 (1989) .................................................................................................. 13

*City of Oklahoma City v. Tuttle*
471 U.S. 808 (1985) .................................................................................................. 17

*City of St. Louis v. Praprotnik*
485 U.S. 112 (1988) .................................................................. 17, 18, 20, 22

*Connick v. Thompson*
563 U.S. 51 (2011) .................................................................................................... 13

*Davis v. City of Ellensburg*
869 F.2d 1230 (9th Cir. 1989)................................................................................... 15

*Doe v. Alameda Unified School District*
2006 WL 734348 *5 (N.D. Cal. Mar. 20, 2006) ...................................................... 14

*E.G. v. Maldonado*
2014 WL 5472654 *1 ................................................................................................ 14

*Ellins v. City of Sierra Madre*
710 F.3d 1049 (9th Cir. 2013)................................................................................... 18

*Estate of Silva v. City of San Diego*
2020 WL 6946011 *16 ....................................................................................... 13, 15

*Flores v. County of Los Angeles*
758 F.3d 1154 (9th Cir. 2014)................................................................................... 14

*Galen v. Cnty. Of L.A.*
477 F.3d 652 (9th Cir. 2007)..................................................................................... 13

- iii -

# TABLE OF AUTHORITIES
(continued)

**Page**

*Gillette v. Delmore*
  979 F.2d 1342 (9th Cir. 1992) ................................................................. 23

*Goldstein v. City of Long Beach*
  715 F.3d 750 (9th Cir. 2013) ................................................................... 18

*Harper v. City of Los Angeles*
  533 F.3d 1010 (9th Cir. 2008) ................................................................. 13

*Hunter v. County of Sacramento*
  652 F.3d 1225 (9th Cir. 2011) ................................................................. 17

*Jensen v. Lane Cnty.*
  222 F.3d 570 (9th Cir. 2000) ................................................................... 12

*Jett v. Dallas Indep. Sch. Dist.*
  491 U.S. 701 (1989) ................................................................................ 20

*Johnson v. County of San Bernardino*
  2020 WL 5224350 (C.D. CA June 24, 2020) ......................................... 14

*Johnson v. State of Cal.*
  207 F.3d 650 (9th Cir. 2000) ................................................................... 12

*Larez v. City of Los Angeles*
  946 F.2d 630 (9th Cir. 1991) ................................................................... 23

*Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*
  507 U.S. 163 (1993) ................................................................................ 12

*Long v. Cnty. of Los Angeles*
  442 F.3d 1178 (9th Cir. 2006) ................................................................. 12

*Lytle v. Carl,*
  382 F.3d 978 (9th Cir. 2004) ............................................... 12, 17, 18, 20, 21

*Monell v. Dep't of Soc. Servs.*
  436 U.S. 658 (1978) ...................................................... 12, 13, 15, 16, 17, 18

*Navarro v. Block*
  250 F.3d 729 (9th Cir. 2001) ................................................................... 12

*Nelson v. City of Davis*
  709 F.Supp.2d 978 (9th Cir. 2010) ......................................................... 23

*Oviatt v. Pearce*
  954 F.2d 1470 (9th Cir. 1992) ............................................................. 13, 15

*Pembaur v. City of Cincinnati*
  475 U.S. 469 (1986) ............................................................................. 18, 23

- iv -

# TABLE OF AUTHORITIES
(continued)

Page

*Price v. Sery*
  513 F.3d 962 (9th Cir. 2008) ........................................................................................ 12

*Spell v. McDaniel*
  824 F.2d 1380 (4th Cir.),
  *cert. denied*, 484 U.S. 1027 (1988) ............................................................................ 17

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) ...................................................................................... 15

*Tsao v. Desert Palace*
  698 F.3d 1128 (9th Cir. 2012) ......................................................................... 13, 14, 15

*Ulrich v. City & Cnty. of San Francisco*
  308 F.3d 968 (9th Cir. 2002) ........................................................................... 13, 18, 19

*Watkins v. City of Oakland*
  145 F.3d 1087 (9th Cir. 1998) ...................................................................................... 23

## STATUTES

42 U.S.C
  § 1983 ................................................................................... 11, 12, 13, 15, 19, 21, 22

San Jose Municipal Code
  § 6.44 ............................................................................................................................ 6
  § 6.44.120 ...................................................................................................................... 4
  6.44.130 ......................................................................................................................... 4

Penal Code
  § 68(a) ........................................................................................................................... 5
  § 261(a)(2) ..................................................................................................................... 5
  § 287(c)(2)(A) ................................................................................................................ 5
  § 518(a) .......................................................................................................................... 5

## OTHER AUTHORITIES

Assembly Bill 1147 ............................................................................................................ 6

Massage Ordinance
  § 6.44.520 .......................................................................................................... 6, 20, 22

Massage Ordinance
  Ordinance No. 29662 ..................................................................................................... 6

San Jose City Charter
  § 400 ............................................................................................................................ 22
  § 411 ............................................................................................................................ 19
  § 701 ............................................................................................................................ 18
  § 701(b); (d) ................................................................................................................. 19

- v -

1

**TABLE OF AUTHORITIES**
(continued)

2
                                                                              **Page**

3   San Jose Municipal Code
      § 3.04.470...................................................................................................... 19
4     § 6.44.040...................................................................................................... 20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF DAI TRANG THI NGUYEN'S OPPOSITION TO MOTION TO DISMISS      CASE NO.
CLAIMS                                                                5:21-CV-00092-EJD

# I.    INTRODUCTION

In 2016, Defendant CITY OF SAN JOSE (the "City") made it a priority to resume its efforts to curb prostitution, human trafficking, and other illicit acts occurring in many of its approximately 5,300 establishments offering massage services by enacting an amendment to its massage ordinance ("Massage Ordinance" or "Ordinance").

This Ordinance—labelled as a top-ten municipal priority—imposed a host of new licensing, permitting, and municipal code requirements on both the establishments and the City's 600 registered massage practitioners. Enforcement authority over these new requirements was specifically granted by the San Jose City Council to the Code Enforcement Division ("CED") of the City's Planning, Building, and Code Enforcement Department ("PBCED"), among other municipal entities.

To conduct code enforcement of the 5,900 establishments and practitioners within the purview of the Massage Ordinance, the City Council and CED knowingly (and comically) assigned a total of one Code Enforcement Inspector to the monumental task, Co-Defendant WILLIAM GERRY ("Gerry"); a solo male officer, to police a largely female industry often conducting transactions in cash. And this solo assignment was not an outlier, of the 703 massage enforcement visits Gerry conducted during his nine year career in the CED, 698 were by himself (well over 99% of the time); a clear City custom and practice. This solo enforcement was allowed even though Gerry had declared personal bankruptcy before he was hired—a fact of which the City was either unaware based on its failure to conduct a background check or one the City intentionally disregarded. To compound the problem, at no time did a CED supervisor or other City employee visit a salon after Gerry to check his work; instead, and at all times relevant, the City chose to *reduce* the degree of supervision over Gerry, leaving the chief leadership and supervisorial role within the CED—the "Code Enforcement Official" position—vacant.

As a consequence, Gerry went on to use the power and authority vested in him by the City to intentionally target and sexually assault, rape, solicit bribes from, and extort numerous massage establishment owners or workers of exclusively Asian ethnicity, including Plaintiff (or "Ms. Nguyen"). Gerry issued a formal CED "Compliance Order" to the salon operated by Plaintiff—a Vietnamese immigrant capable of speaking only broken English—which identified a host of code violations and ordered an immediate cessation of massage activities. He then visited Plaintiff and told her she could avoid closure if she made

regular cash payments to him in small bills in a plain envelope. To make this schedule clearer, he wrote the cash amounts and dates of the extortionate payments on a City of San Jose Application Packet For Massage Permit and handed it to her. Facing the loss of her business, Plaintiff paid Gerry $34,000 over an approximate three-month period. During the same period, Gerry forced Plaintiff to orally copulate him on four occasions and vaginally raped her once. Gerry did this while he was on duty driving a City car and wearing a CED badge.

As a result of this and other conduct, Gerry is currently in custody awaiting trial on a 14-count criminal complaint ("Criminal Complaint") alleging the same (and additional) illegal and criminal acts that form the basis of this civil action.

Tragically, City policy-makers were specifically alerted to Gerry's sexual and extortive misconduct in a series of letters and whistleblower complaints from and regarding other Asian masseuses well before he assaulted, raped, and extorted Plaintiff. Included among these complaints were photographs of Gerry engaging in amorous and unprofessional behavior with a female Asian masseuse while he was supposedly conducting an enforcement visit on her salon. Gerry even admitted to a supervisor that he engaged in frequent hugs and kisses with targets of his enforcement activities. The City's subsequent—and stunning— failure to discipline, supervise, or adopt policies to prevent constitutional violations, or otherwise stop Gerry's behavior was intentional and in deliberate indifference to the safety of Plaintiff and other similarly situated citizens; it proximately and foreseeably caused Plaintiff's severe physical, emotional, and psychiatric injuries. At all times relevant, the City had the means to institute reasonable and adequate safeguards to prevent Gerry's pattern of repulsive behavior but chose not to do so.

As the next section of this Opposition illustrates, Plaintiff's Complaint allegations of constitutional violations committed by municipal actors are as detailed as they come. The City's Motion to Dismiss conveniently omits many of these salient facts that sufficiently plead liability not just of Defendant Gerry, but also of the municipality. Deliberate decisions or inaction by the municipality allowed Defendant Gerry's perverted scheme to go unchecked. The Motion should be denied, among other reasons, because the Complaint plausibly pleads that (1) the City was deliberately indifferent in the enforcement of its new official massage ordinance; (2) the City had a longstanding custom and practice of unsupervised solo male code enforcement of massage establishments at the time of the constitutional violations against Plaintiff; (3)

PLAINTIFF DAI TRANG THI NGUYEN'S OPPOSITION TO MOTION TO DISMISS CLAIMS

CASE NO.
5:21-CV-00092-EJD

Municipal actors with (official or *de facto*) policymaking authority of the City at multiple levels made or ratified policy decisions that proximately caused the violations of Plaintiff's civil rights; including the failure to discipline or investigate numerous explicit complaints of Gerry's unconstitutional sexual assault, rape and extortion from other victims which preceded Plaintiff becoming a victim of Gerry.

## II.     SUMMARY OF COMPLAINT

Plaintiff incorporates by reference the complete factual statement made in the Complaint (Doc. 1 at ¶¶ 19-79), and summarizes both those facts and the Causes of Action in relevant part below.

**A.     William Gerry & the City Code Enforcement Division**

In 2007, the City hired Gerry as a Code Enforcement Inspector to serve within the CED of the City's PBCED. Doc. 1 at ¶ 20. The PBCED did not conduct a background check of Gerry before hiring him. *Id.* at ¶ 21. If it had, the City would have discovered that Gerry had declared bankruptcy in 1997 with over a dozen named creditors including banks, credit card agencies, retailers, and individuals. *Id.* Such information regarding Gerry's money mismanagement would have or should have served as a major red flag in his hiring; especially regarding his fitness to be employed in an unsupervised capacity over the permitting of small businesses operating primarily on a cash basis. *Id.*

As a Code Enforcement Inspector, Gerry reported directly to Joseph Hatfield ("Hatfield"), Supervisor of the Special Programs Group within the Special Operations Section of the CED. *Id.* at ¶ 22. Hatfield in turn reported to Rachel Roberts ("Roberts"), who served as another level of supervision within the CED, either as Special Operations Division Manager or as the Acting Head Code Enforcement Official of the CED or both. *Id.*

Hatfield and Roberts had sole supervisorial authority and responsibility over Gerry and were actually aware of and/or deliberately indifferent to Gerry's pattern, custom, practice, and policy of depriving civil rights to the massage practitioners he regulated. *Id.* at ¶ 23. Hatfield and Roberts had the authority to discipline and/or terminate Gerry, and to otherwise prevent Gerry from committing constitutional violations against Plaintiff while acting under color of law, but did not. *Id.*

In 2016, as set forth in further detail below, the City implemented its new "Massage Ordinance" designed to combat prostitution, human trafficking, and other offenses known as prevalent within the City's massage industry. *Id.* at ¶ 24. In 2017, Gerry was designated by the City as the *only* Code Enforcement

Inspector to conduct outreach to the City's massage industry regarding these new requirements of the Ordinance. In that capacity, Gerry was officially designated as the "Code Enforcement Inspector II—Massage," in CED Organizational Charts. *Id*. at ¶ 25.

The SJPD "Vice Unit" (hereinafter "Vice Unit") worked collaboratively with Gerry to carry out enforcement activities targeting massage parlors, thereby vesting Gerry with certain law enforcement duties. *Id*. at ¶ 26. Due in part to Gerry's close collaboration with the Vice Unit, Plaintiff was unable to distinguish Gerry from a police officer. *Id*.

**B.      Gerry's Civil Rights Violations against Plaintiff**

Ms. Nguyen is a naturalized United States citizen of Vietnamese descent who speaks only broken English. *Id*. at ¶ 27. At all times relevant and prior to the opening of her massage parlor, Ms. Nguyen was a licensed massage therapist in California. *Id*. at ¶ 28. On or about November 30, 2018, Ms. Nguyen entered into a commercial lease of the property at 1692 Tully Road, #12, San Jose, California, for the purpose of operating a massage parlor named "Soft Touch Spa" (the "Spa"). *Id*. at ¶ 26.

On or about December 20, 2018, pursuant to the Massage Ordinance, Gerry issued a "City of San Jose – Compliance Order" ("Order") on PBCED letterhead to the owner of 1692 Tully Road, #12. *Id*. at ¶ 30, Ex. 2. The Order stated the Spa was operating without a Massage Business Permit and License as required by Municipal Code §§ 6.44.120 and 6.44.130. Gerry's Order directed that massage operations cease immediately. The owner notified Ms. Nguyen of the Order. *Id*.

Between January 8 and March 20, 2019, Gerry used the threat of this Order to sexually assault Plaintiff on five occasions and force her to make four extortionate cash payments totaling $34,000. As noted, this conduct was committed by Gerry while on duty and acting within the course and scope of his employment. *Id*. at ¶¶ 27-48.

After his fifth sexual assault (a vaginal rape), Gerry left the Spa never to return. Plaintiff never heard from him again despite her repeated—and increasingly desperate—text communications over a span of months inquiring about her permits and money. *Id*. at ¶ 49. Unbeknownst to Ms. Nguyen, shortly after raping her Gerry resigned as a Code Enforcement Inspector and relocated to Texas. *Id*. at ¶ 50.

After Gerry's resignation, the City resumed its code enforcement efforts aimed at Ms. Nguyen's Spa. On June 2, 2019, the SJPD informed her landlord that the Soft Touch Spa would have to close because of a

- 4 -

1    failure to obtain proper licenses and permits. *Id.* at ¶ 52.

2        After struggling financially for months, Ms. Nguyen succumbed to the emotional damage inflicted by

3    Gerry. She became increasingly anxious and mentally unstable. *Id.* at ¶ 57. On July 15, 2020, Ms. Nguyen

4    went to the Kaiser Permanente Hospital in San Jose seeking treatment for her mental distress and suicidal

5    thoughts. She was quickly transferred to the Emergency Psychiatric Services Unit of the Valley Medical

6    Center ("EPS") where she tearfully told nurses of Gerry's sexual assaults and extortion. *Id.* at ¶¶ 58-59. As

7    required by law, EPS informed the SJPD, which led to Gerry's eventual arrest. *Id.* at ¶ 59.

8    **C.    Gerry's Arrest and Other Victims.**

9        The crimes targeting Ms. Nguyen were unfortunately representative of a much larger pattern of

10   misconduct. On September 29, 2020, a 14-count Criminal Complaint against Gerry was signed by the

11   Honorable Paul Bernal, Judge of the Superior Court of the County of Santa Clara. Included among the

12   fourteen felony counts were four counts of forced oral copulation in violation of Cal. Penal Code §

13   287(c)(2)(A), one count of rape in violation of Cal. Penal Code § 261(a)(2), seven counts of extortion under

14   the color of authority in violation of Cal. Penal Code § 518(a), and three counts of bribery by a government

15   employee in violation of Cal. Penal Code § 68(a). *Id.* at ¶ 64, Ex. 1.

16       In addition to the sexual and economic crimes targeting Ms. Nguyen (identified in the Criminal

17   Complaint as "Jane Doe" in Counts One through Nine), the complaint alleges extortion and bribery offenses

18   against Ming Qiang Fang and Zuolun Zhang, owners of other massage parlors in the City. The SJPD

19   investigation also revealed that Gerry committed sex and extortive crimes under the color of his authority

20   against other women in the massage industry. *Id.* at ¶ 66. These other crimes against exclusively Asian

21   victims, occurred from mid-2018 to early 2019. *Id.* at ¶¶ 70-74.

22       To date, the total amount of extortionate payments Gerry extracted under color of authority from

23   identified victims is $63,000: $34,000 from Ms. Nguyen; $10,000 from Zuolun Zhang; and $19,000 from

24   Ming Qiang Fang. *Id.* at Ex. 4, ¶¶ 4, 6-8. However, the SJPD found Gerry made a total of $140,000 of

25   unexplained cash deposits to his personal bank accounts between March and May 2019. Based on

26   information and belief, Gerry made $95,513.32 in 2018 from his salary as municipal Code Enforcement

27   Inspector II. *Id.* at ¶ 76. The SJPD concluded that a portion of these unexplained cash deposits represented

28   extortionate sums from "unknown" victims. *Id.* at Ex. 4, ¶¶ 12-17.

PLAINTIFF DAI TRANG THI NGUYEN'S OPPOSITION TO MOTION TO DISMISS
CLAIMS

CASE NO.
5:21-CV-00092-EJD

**D.      The City's Unconstitutional Policies, Customs, or Practices.**

Gerry's misconduct was committed in furtherance of an affirmative City policy aimed at using the CED to combat illicit activity within massage parlors and spas. The City's grossly inadequate implementation of this policy and its deliberate lack of oversight were direct and proximate causes of the deprivation of Plaintiff's civil rights afforded by the U.S. and California Constitutions.

**1.      Gerry Acted Pursuant to an Express City Policy of Enhanced Massage Enforcement**

On September 18, 2014, Assembly Bill 1147 ("AB 1147"), The Massage Therapy Act, was signed into law. It took effect on January 1, 2015. Under AB 1147, cities and counties became able to regulate massage businesses within their own jurisdictions. *Id.* at ¶ 81. The San Jose City Council ("Council" or "City Council") in turn voted that modification of the City's outdated Massage Ordinance be made a top municipal priority to combat prostitution and human trafficking. *Id.* at ¶ 82, Ex. 5.

On December 15, 2015, the Council approved Ordinance No. 29662, the Massage Ordinance, which amended Section 6.44 of the City Municipal Code. *Id.* at ¶ 85, Ex. 7. The amendments required massage establishments to (1) maintain valid business permits issued by the Chief of Police, (2) maintain valid ownership/management licenses also issued by the Chief of Police, and (3) ensure that individual masseuses be certified as massage therapists, among other requirements. *Id.* at ¶ 87. Section 6.44.520 of the Massage Ordinance also specified which City agencies had authority to inspect massage premises under the Ordinance: "the Police Department, Fire Department, and *Planning, Building, and Code Enforcement Department*…" (Emphasis added). *Id.* at ¶ 88.

On March 7, 2017, the City Council added the Personal Care Business Compliance Initiative ("Initiative") to the Council Priority List and officially ranked it as No. 10 of the City's new policy priorities. The Initiative echoed the goals of the Massage Ordinance and was aimed squarely at regulating the massage industry through "enhanced outreach," among other tactics. *Id.* at ¶ 89. The City Council clearly intended that PBCED be at the forefront of enforcement operations in support of its new massage policy since it expressly delegated enforcement authority to that municipal component.

It was these enhanced enforcement protocols that Gerry used to his illegal and tortious advantage.

### 2. Gerry was the Final Policy Maker Regarding Massage Code Enforcement.

The Public Safety, Finance, and Strategic Support ("PSFSS") Committee of the City Council in Fiscal Year 2017-2018 formally approved funding in the Adopted Budget for the PBCED for a [single] Code Inspector to work in partnership with the Police Department on massage enforcement. *Id.* at ¶ 92, Ex. 8, pp. 3-4 (City Council Memorandum to the PSFSS re the "Massage Parlors Ordinance Status Report"). In 2017, Gerry was designated as this sole code enforcer responsible for the implementation of the Massage Ordinance. *Id.* at ¶ 93. As such, he was given final policy-making authority over the frequency, necessity, timing, and manner of inspections of City massage businesses; the issuance of citations for administrative, building, and other municipal code violations to businesses offering massage services; *de facto* authority over the approval or denial of applications for massage permits; and the ability to directly communicate with massage establishment owners and operators regarding options to make their businesses code compliant. *Id.* at ¶ 93. Gerry utilized this assigned final policy-making authority on behalf of the City to exploit Plaintiff and others for sex and money.

### 3. Gerry Acted Pursuant to the City's Long-Standing Practice of Unsupervised Solo Massage Enforcement.

As noted, Gerry conducted approximately 703 massage enforcement visits between 2011 and 2019. He acted alone on all but five occasions. *Id.* at ¶ 96. To make matters worse, there was no supervisorial quality control of Gerry's solo outreach visits. In the same nine-year period, Gerry's unit supervisor, Joseph Hatfield, attended just two of Gerry's massage enforcement actions and Rachel Roberts, Gerry's Division Supervisor, attended none. *Id.* PBCED records further demonstrate that neither Hatfield nor Roberts conducted any follow-up outreach to spas to check on Gerry's conduct and professionalism in dealing with the public. *Id.* at ¶ 97.

### 4. The City's Deliberate Indifference toward Hiring, Supervision, Discipline, and the Adoption of Policies to Prevent Constitutional Violations

Even at the inception of the Massage Ordinance's enhanced enforcement regime, the City abjectly failed to adequately staff or fund the ambitious program. On March 2, 2016, City Chief of Police Edgardo Garcia ("Chief Garcia") authored a memorandum to a City Council committee notifying the Council of the enormity of the task ahead enforcing the Massage Ordinance. *Id.* at ¶ 100, Ex. 9.

In the memorandum, Chief Garcia stated that during calendar years 2008-2015, the City "stopped requiring and enforcing businesses to obtain a Massage Business Permit from the City, and [consequently] the Police Department no longer had ready access to a database of massage establishments." Chief Garcia noted that approximately 295 parlors had been identified in concentrated 'hot spots' throughout San Jose, and that the Vice Unit was just starting outreach to those establishments. Chief Garcia went on to highlight the utility of a "task-force" approach in which the undermanned Vice Unit could leverage other city agencies including the PBCED. *Id.*

In a follow-up memorandum on September 13, 2017, Chief Garcia noted again the severe lack of staffing available within the SJPD to enforce the "new Massage Ordinance." Chief Garcia confirmed there were "300 known massage businesses that were likely subject to the requirements of the new ordinance." He also cited data identifying 600 certified massage therapists in the City as well as 5,300 licensed establishments offering massage services. Chief Garcia stated that each of these city massage therapists and establishments—totaling approximately 5,900—would require outreach pursuant to the Ordinance. *Id.* at ¶ 102. And that number reflected only the licensed establishments.

In his September 13, 2017 memorandum, Chief Garcia also admitted that "due to department-wide staffing shortages, enforcement has been limited and must be prioritized…with the September 2016 shift change, sworn staff were redeployed to the patrol division effectively reducing the Vice Unit's staffing to one sergeant. From January 2017 to August 2017, *the Vice Unit lost allocated full time staffing with redeployment of the remaining sergeant position*." *Id.* at ¶ 103 (Emphasis added).

So at a time when the City made the enforcement of massage violations one of its top municipal priorities with the enactment of a tough new Ordinance designed to combat perceived serious crimes including human trafficking, the City Council allocated exactly zero additional officers to the SJPD's Vice Unit, the main investigative body charged with criminal enforcement. In fact, the City allowed the Vice Unit's enforcement staffing regarding the Ordinance during that same period to wither from one officer to none. *Id.* at ¶ 104.

Even though that position was eventually restored, the Vice Unit was clearly overwhelmed and was forced to rely heavily on the PBCED (Gerry). In his memorandum, Chief Garcia cited as a positive development the City's decision to "add a [single] dedicated Code Inspector to work in partnership with the

Police Department on massage enforcement." *Id*. at ¶ 105.

Thus, the City Council knowingly allowed a single Code Inspector to police a group of unsuspecting and vulnerable victims, most without the English language skills or cultural awareness to stand up for themselves. One code inspector to provide enforcement oversight to 5,900 locations and individuals; a level of municipal indifference to staffing, hiring, and the safety of the affected massage workers that would be laughable if the consequences were not so deplorably serious. *Id*. at ¶ 106.

This inexcusable and deliberate understaffing of the PBCED's massage section extended to the Division's supervision as well. In March 2018, approximately one year before Plaintiff was raped, the "Code Enforcement Official" in charge of supervising two divisions of the CED (Field Operations and Special Operations) retired. *Id*. at ¶ 108. Field Operations and Special Operations themselves were responsible for eight Units staffed by more than 60 employees. *Id*. at ¶ 107, Ex. 10 (Organizational Chart of the CED, dated September 1, 2017). One of these Units was "Special Programs," where Gerry was assigned as the sole inspector of massage establishments. The Code Enforcement Official position was not re-staffed during the rest of 2018 and the entirety of 2019, when Gerry was running his criminal enterprise. *Id*. Eventually Roberts, the manager of the Special Operations Division, was asked to continue that supervisorial job over approximately 30 enforcement personnel (including Gerry) and also take over the retired Code Enforcement Official's job, effectively doubling the amount of personnel and divisions she was tasked with supervising. *Id*. at ¶ 112, Ex. 12 (Organizational Charts of the PBCED, dated December 3, 2018).

In effect, one of the only two supervisors who could have reigned in the one male code officer tasked with enforcement of the overwhelmingly female massage industry, was removed and not replaced during the entirety of Gerry's myriad of Constitutional violations. The City Council did not bother to maintain even the minimal level of supervision it itself envisioned when it set up the CED. The City Council's deliberate business decision not to fill such a vital position and provide competent supervision was a direct, legal, and foreseeable factor which enabled Gerry's repeated acts of rape, sexual assault, and extortion. *Id*. And not only were there not enough supervisors to effectively manage massage enforcement within the CED, but the City's custom and practice of keeping its few supervisors out of the field eviscerated any effective oversight ability they might have had. Such a complete lack of attention constituted a deliberate indifference to supervision by the City with foreseeable and disastrous results for Plaintiff. *Id*. at ¶ 113.

This lack of oversight was equally applicable to [the lack of] supervisorial review of Gerry's written records of enforcement. At all times relevant herein, the PBCED kept a chronological record of enforcement actions taken at individual establishments entitled "City of San Jose Case Summary Report" ("CSR"). *Id.* at ¶ 114. As noted in the Complaint, even a cursory review of the CSR for the Soft Touch Spa would have revealed to a competent supervisor that something was amiss. *Id.* at ¶¶ 114–115; Ex. 2

### 5.   The City had Actual Notice and Knowledge of Gerry's Unfitness

On October 25, 2018, a letter with enclosed photographs was received by Rachel Roberts. *Id.* at ¶ 115, Ex. 13. The letter noted (colloquially) that Gerry was having intercourse with a female masseuse at "CEO Spa" in San Jose. The letter questioned why Gerry had given "application over 3 month [sic]" to that Spa despite "this spa not only [providing] massage ok…?" Despite the broken English, the message conveyed in the letter was absolutely clear: Gerry was giving an apparent brothel a pass on code enforcement in return for sexual favors. *Id.*[1] The photographs only confirmed this inference as they showed highly inappropriate and amorous physical contact between Gerry and an Asian masseuse. *Id.*

At the time of the receipt of the letter Roberts was serving as the Acting Director of the CED. Instead of conducting an investigation of Gerry, Roberts shared the letters and photographs with him and treated him as a potential victim of extortion even after Gerry identified himself and the female spa employee and confirmed the images were taken during an official outreach. In the meeting, Gerry claimed that such behavior was not uncommon and that he often received embraces and kisses from other female massage employees during his enforcement activities. *Id.* at ¶ 119

Rather than limiting Gerry to a desk pending an investigation, or mandating that he only perform industry outreach in the presence of other inspectors, or adopting other procedures designed to stop this conduct, Roberts simply turned the letters over to the SJPD to conduct a criminal investigation of the individual who sent the letter. *Id.* at ¶ 120. 76 days later Gerry forced Plaintiff to orally copulate him after forcing her to pay him $10,000. *Id.*

---

[1] The CEO Spa was the subject of two other complaints received by the City in November 2018, reporting rampant prostitution. Both letters were hand-written on "Rubmaps" printouts. Rubmaps describes itself at the "Internet's #1 massage parlor review site" and has assessment categories including "Breast size," "Rate Ass," "Implants," and descriptions of the various types of sex an establishment offers. The illicit categories for the CEO Spa were all checked affirmatively meaning the parlor was operating openly as a brothel. The handwritten letters on the printouts reported that CEO spa had unlicensed and minor masseuses performing more than just massages and requesting the police shut the spa down.

On December 16, 2018, 42 days after the delivery of the above complaint and approximately 30 days after the two 'Rubmaps' notifications that indicated a spa where Gerry was amorously touching masseuses was operating as a brothel, and 25 days before Plaintiff was first sexually assaulted, an anonymous email was sent to the City's "Whistleblower Hotline." *Id.* at ¶ 121, Ex. 14. The email reported that Gerry was "violating the city code of ethics and taking advantage of the fear people in the Asian community have of the government and police." *Id.* The email recounted instances of Gerry improperly touching female masseuses, his wanton attempts to get them alone in massage parlor "backrooms," and his receipt of money from establishments not in compliance with the Massage Ordinance. *Id.* The email concluded with the following commentary: "…it makes me sad that someone like him is taking advantage of immigrants through fear, unwanted sexual advances, and bribes." *Id.* Ex. 14. The email was received and reviewed by a Senior Executive Analyst within the City's Office of Employee Relations and forwarded to the SJPD and, on information and belief, to Roberts. Shockingly, and despite the previous complaints received just weeks earlier, Gerry's supervisors allowed him to continue his solo enforcement with disastrous results.

### 6.     The Discriminatory Enforcement of the Massage Ordinance against Asian Female Massage Business Owners and Masseuses.

Gerry intentionally targeted Asian massage parlor owners, operators, and masseuses in selectively enforcing and abusing the authority vested in him as a Code Enforcement Inspector. Out of the thousands of massage establishments and therapists subject to Gerry's outreach, to date all of the victims have been identified as being of Asian ethnicity or national origin. *Id.* at ¶ 121, see also Ex. 4, ¶ 11.

## E.     Causes of Action

Plaintiff brings this lawsuit alleging three claims for relief under 42 U.S.C § 1983, including for the deprivation of civil rights secured by the due process and equal protection clauses of the Fourteenth Amendment. Plaintiff's substantive due process right to bodily integrity and privacy, i.e. to be free of sexual assault, rape, battery and other unlawful and offensive touching was violated. Plaintiff's constitutional rights were also violated by depriving her of her property interest in her massage parlor and the benefits of her business through the extortion and false statements, and because Plaintiff could not get a permit without complying with Gerry's demands for sexual favors and money. Moreover, Plaintiff is entitled to equal protection of the laws as an Asian female massage parlor owner and massage therapist. Asian massage parlor

- 11 -

owners or masseuses in the City, including Plaintiff, were targeted and made victims of Gerry tortuous conduct and the City's failures in staffing, supervision, policy-implementation, and decision-making.

## III.   STANDARD OF REVIEW

In considering the City's Motion, the Court must accept that "all the allegations in the complaint are true (even if doubtful in fact)" and must draw all reasonable inferences in Plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The Motion must be denied if the Complaint contains sufficient facts taken as true that allow it "to draw the reasonable inference" that Defendants are liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There is no "heightened pleading standard" in civil rights cases alleging municipal liability under § 1983. See *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993). In fact, courts have emphasized "the rule of liberal construction is 'particularly important in civil rights cases.'" *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000).

## IV.   LEGAL ARGUMENT

**A.   Gerry's Rampant Sexual and Economic Misconduct Violated 42 U.S.C. § 1983.**

The City does not and cannot contest co-defendant Gerry's § 1983 liability since his reprehensible conduct (1) was committed by a person acting under color of state law, and (2) deprived the plaintiff of a federal constitutional or statutory right. See *Jensen v. Lane Cnty.*, 222 F.3d 570, 574 (9th Cir. 2000).

**B.   Plaintiff Has Alleged Facts Sufficient to Hold The City Liable Under 42 U.S.C. § 1983.**

**1.   Municipal Liability Pursuant to *Monell*.**

In *Monell*, the United States Supreme Court held that municipalities are "persons" subject to liability under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Such municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. *See Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004); *Ulrich v. City & Cnty. of San Francisco*,

- 12 -

1  308 F.3d 968, 984–85 (9th Cir. 2002); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1995).

2      After establishing one of the above methods of liability, a plaintiff must show that the challenged

3  municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation.

4  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *Trevino*, 99 F.3d at 918. The municipality

5  is liable if the individual can establish that the local government "had a deliberate policy, custom, or practice

6  that was the 'moving force' behind the constitutional violation she suffered." *Galen v. Cnty. Of L.A.*, 477

7  F.3d 652, 667 (9th Cir. 2007) (*quoting Monell*, *supra,* 436 U.S. at 694-695.)

8          **2.     The City was Deliberately Indifferent in the Enforcement of its Massage Policies,
                   Ordinances, and Regulations.**

9

10      In order to establish *Monell* liability for a municipality based on its policy, a Plaintiff must show that

11  the policy amounted to a "deliberate indifference" to her constitutional rights. *Anderson v. Warner*, 451 F.3d

12  1063, 1070 (9th Cir. 2005). The policy itself need not be facially invalid. In *City of Canton v. Harris*, 489

13  U.S. 378, 386 (1989), the Supreme Court specifically rejected the contention that § 1983 liability can be

14  imposed on a municipality only if the municipal policy (or custom) in question is itself unconstitutional. A

15  valid custom or policy may incur § 1983 if it is unconstitutionally applied. *Id*. at 387.

16      Municipal policies and practices may incur § 1983 liability when they are deliberately indifferent to an

17  employee's supervision or discipline, training, or to the adoption of polices necessary to prevent

18  constitutional violations. See *Estate of Silva v. City of San Diego*, 2020 WL 6946011 *16, *Bd. of County

19  Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 411 (1997); *Canton, supra* at 379; *Oviatt v. Pearce*,

20  954 F.2d 1470, 1477 (9th Cir. 1992). Deliberate indifference requires proof that a municipal actor disregarded

21  a known or obvious consequence of his action. *Brown, supra* at 410.

22      In discussing the concept of deliberate indifference in its Motion to Dismiss, the City focuses virtually

23  entirely on the requirements of § 1983 liability when a municipality is alleged to have failed to train its

24  employees. (Doc. 30 at ¶13, 14, 16). In support of this analysis, the City relies on eight cases which discuss

25  § 1983 liability for failing to train an employee: *Canton, supra,* 489 U.S. at p. 379 (failure to train jail medical

26  staff); *Tsao v. Desert Palace*, 698 F.3d 1128, 1145 (9th Cir. 2012) (failure to train casino personnel); *A.C. v.

27  City of Santa Clara*, 2015 WL 5350412 *9 (failure to train police officers); *Connick v. Thompson*, 563 U.S.

28  51, 54 (2011) (failure to train prosecutors on the disclosure of *Brady* material); *Johnson v. County of San*

*Bernardino*, 2020 WL 5224350 (C.D. CA June 24, 2020) (generalized allegation of failing to train police officer in alleged wrongful arrest case); *Flores v. County of Los Angeles*, 758 F.3d 1154, 1156-1157 (9th Cir. 2014) (failure to train unidentified deputy who allegedly fondled plaintiff at a courthouse when she appeared in relation to a traffic ticket); *E.G. v. Maldonado*, 2014 WL 5472654 *1 (failure to train a security guard who sexually assaulted a minor in a county subsidized hospital); and *Doe v. Alameda Unified School District*, 2006 WL 734348 *5 (N.D. Cal. Mar. 20, 2006) (failure to train worker in alleged sexual assault of a minor in a county day care center).

However, Plaintiff in her complaint does not allege that the City was deliberately indifferent in training Gerry. (Doc. 1 at p. 21). Plaintiff is unaware of methods to train human beings not to commit the felonies of rape, sexual assault, and extortion; a concept with which the Ninth Circuit agrees. *See e.g.*, *Flores*, *supra* at 1160 ("If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence…"). As a consequence, much of the City's argument—based on the standards relevant in failure-to-train cases—should be disregarded as moot.

The City frames its argument based on the brief deliberate indifference analysis in the district court decision in *Doe v. Alameda Unified Sch. Dist.*, *supra* at *7. First, the *Doe* decision is not binding on this Court. *See i.e., Camreta v. Greene*, 563 U.S. 692, 709 (2011) (decision of one district court from the same or different district not binding on another district court). Second and as noted, Plaintiff does not contest the City's training of Gerry. Third, the Ninth Circuit has more recently defined the test for deliberate indifference. *See Tsao v. Desert Palace, Inc.*, *supra* at 1145 (9th Cir. 2012) ("To show deliberate indifference, [Plaintiff] must demonstrate 'that [the municipality] was on actual or constructive notice that its omission would likely result in a constitutional violation.' [Citations.] Only then does the omission become 'the functional equivalent of a decision by [the municipality] itself to violate the Constitution…[p]olicies of omission regarding the supervision of employees...can be 'policies' or 'customs' that create municipal liability...only if the omission 'reflects a deliberate or conscious choice' to countenance the possibility of a constitutional violation.'"). As noted and as further discussed below, Plaintiff *does* allege actual and constructive knowledge that the City's failure to supervise would likely result in a constitutional violation because of the ignored complaints against Gerry and the City's deliberate understaffing of Massage Ordinance enforcement.

- 14 -

### a. The City Failed to Effectively Supervise or Discipline Gerry

To establish a § 1983 claim of failure to supervise and discipline, a plaintiff must allege that the supervisory defendant's conduct was sufficiently inadequate to constitute deliberate indifference to the plaintiff's rights. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). This requires the plaintiff to allege that the supervisory defendant was on actual or constructive notice that the failure to supervise or discipline would likely result in a constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Section 1983 liability of this type may be based on a supervisor's failure to investigate misconduct by a subordinate. *Silva*, *supra* at *17, *citing Starr*, *supra* at 1207. The plaintiff must also allege that the supervisory defendant's action or inaction was the actual or proximate cause of the constitutional violation. *Id.*

As noted, when Gerry's sexual and economic misconduct at the CEO Spa was brought specifically to the attention of the head of the CED by letter, whistleblower email, and photographic evidence, she did nothing to investigate. She made no visits to the spa in question, she did not task one of her dozens of trained investigators to interview masseuses or the author of the letter, she did not attempt to find the whistleblower, nor did she mandate that Gerry only conduct future enforcement operations with another employee. Her inaction unleashed Gerry back into the public and proximately caused Plaintiff's constitutional violations less than three months later.

### b. The City Failed to Adopt Policies Necessary to Prevent Constitutional Violations

Policies of inaction as well as policies of action can give rise to *Monell* liability. A policy of inaction or omission may be based on the failure to implement procedural safeguards to prevent constitutional violations. *Oviatt, supra* at 1477; *Tsao*, *supra* at 1143 ("In inaction cases, the plaintiff must show, first, 'that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right.") *Id.* at 1143. "This requires showing that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1145. A plaintiff must show "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Id.* at 1143.

The City could easily have adopted one of several common sense policies to check Gerry's repetitive misconduct, including providing him a partner—preferably female—on his enforcement visits; have supervisors randomly meet him at parlors when he was conducting inspections; contact massage owners

separately after Gerry's visits to check on his professionalism; investigate one of the multiple complaints against him; or question his written enforcement logs. In a municipal division with (by Plaintiff's count) approximately 42 inspectors on staff at the time of Defendant's outreach to Plaintiff, such basic investigation would not seem too much to ask. Since the City did not address this theory of liability in its Motion, this Court should let this allegation stand.

> **c.     The City's Failure to Conduct a Background Check of Gerry Constituted Deliberate Indifference in his Hiring.**

The Supreme Court has held that when adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the "plainly obvious" consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected rights, the governmental entity may be held liable under *Monell*, on the grounds that the municipality's decision to hire such an individual can constitute 'deliberate indifference' to the rights of a third person.  *Brown*, *supra* at 409-411. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged. *Id.*

The City and CED's policy of not conducting background checks of Code Enforcement Inspectors such as Gerry placed an individual with (at a minimum) known money mismanagement issues resulting in personal bankruptcy (Doc. 1 ¶ 21) into an unsupervised oversite capacity of a cash industry. The extortion and bribery that followed were an obvious link between the City's inadequate decision to hire Gerry for a job to which he was clearly not suited. Since the City did not address this theory of liability its Motion, this Court should also let this allegation stand.

> **3.     The City's Custom and Practice of Unsupervised Solo Male Code Enforcement Constituted Deliberate Indifference In Supervision and Discipline**

42 U.S.C. § 1983, provides:

> "Every person who, under color of any statute, ordinance, regulation, ***custom***, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." (Emphasis added).

"Local governments...may be sued for constitutional deprivations visited pursuant to governmental

'custom' even though such a custom has not received formal approval through the municipality's official decision-making channels." *Monell* at pp. 690–691. An act performed pursuant to a custom that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. *Brown*, *supra* at 404.

Courts have established two requirements for plaintiffs to meet in maintaining a § 1983 action grounded upon an unconstitutional municipal custom. First, the custom or practice must be attributable to the municipality; it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it and yet did nothing to end the practice. *See Spell v. McDaniel*, 824 F.2d 1380, 1386–88 (4th Cir.), *cert. denied*, 484 U.S. 1027 (1988); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985); *Monell*, 436 U.S. at 694–95.

As discussed above, Gerry's custom as the sole Code Enforcement Inspector for the entire San Jose massage industry was to conduct his enforcement alone with no effective supervision. San Jose's established, year-in and year-out practice was to send him out by himself almost 700 times. The City had clear actual or constructive knowledge of this highly problematic practice and chose not to take corrective action or discipline him when his misconduct was identified. This custom of no oversite nor remedial consequence clearly emboldened Gerry and was the moving force behind the deprivation of the Plaintiff's constitutional rights. *See also*, *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011) (For a *Monell* claim of inadequate discipline, "evidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality.").

**4.      Decisions of City Final Policy-Makers Caused the Constitutional Violations Suffered by Plaintiff.**

*Monell* liability may attach when the official or employee who caused a constitutional violation was acting as a "final policymaker." *Lytle*, *supra,* 382 F.3d 978, 981 (9th Cir. 2004). "To hold a local governing body liable for an official's conduct, a plaintiff must first show that the official (1) had final policymaking authority concerning the action … at issue; and (2) was the policymaker for the local governing body for the

purposes of the particular act." *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013) (citations omitted).

Whether an official is a policymaker for *Monell* purposes is a question of state law. *Praprotnik*, 485 U.S. at 123; see also *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). The determination is made on a function-by-function approach analyzed under the state organizational structure. *Goldstein*, 715 F.3d at 753. A "policy" is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Fogel*, 531 F.3d at 834; see also *Lytle,* 382 F.3d at 983 ("For purposes of *Monell* liability, the term 'policy' includes…'a course of action *tailored to a particular situation* and not intended to control decisions in later situations.'") (Emphasis in original).

A municipality may be liable for the acts of a final policymaker if these acts caused a constitutional violation, even if the constitutional violation occurs only once. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 & n.6 (1986). In certain situations, a municipality is also liable if a policymaking official fully delegates his or her discretionary authority to a subordinate, and the subordinate uses that discretion. *Fogel*, *supra* at 834-35; *see also Praprotnik*, 485 U.S. at 112; *Lytle,* 382 F.3d at 983 ("While '[a]uthority to make municipal policy may be granted directly by a legislative enactment,' it may also be 'delegated by an official who possesses such authority.'"). An official may be found to have been delegated final policymaking authority when the official's discretionary decision is unconstrained by policies not of that official's making and unreviewable by the municipality's authorized policymakers. *Ulrich*, *supra,* 308 F.3d at 986.

> ### a.   The City's Chief Code Enforcement Official was a Final Policy Maker Regarding Massage Enforcement.

The City concedes that the City Manager is a policymaker. Doc. 30, p.7:7-9; see also SAN JOSE, CAL. CITY CHARTER § 701 ("The City Manager shall be the chief administrative officer of the City. . . . the City Manager shall appoint all officers and employees of the City; and, when he or she deems it necessary for the good of the service, the City Manager may…suspend without pay, demote, discharge, remove or discipline any City officer or employee…), *see* Doc. 30 at Appx 1. The City Manager has the authority to "direct and supervise the administration of all departments, offices and agencies of the City" and was granted the power to "exercise such other powers, and shall preform such other duties, as are specified in [the] Charter or may

be authorized or required by the Council." SAN JOSE, CAL., CITY CHARTER § 701(b); (d). *Id.* The City Manager also has the power to change the duties, responsibilities and functions of a position. SAN JOSE, CAL., MUN. CODE § 3.04.470. *See* Exhibit 1 attached. The City Manager thus has the power to direct and delegate his authority with respect to directing and supervising the administration of departments. The consideration of whether the City Manager delegated his authority may turn on questions of fact. *Ulrich*, 308 F.3d at 985.

In this case, the City Manager delegated his final policymaking authority over the supervision and employees of the CED to the Chief City Code Enforcement Official, Rachel Roberts. (See Doc. 1 ¶¶ 22, 23, 110). Roberts exercised this authority when she *disregarded* a complaint about Gerry that included serious accusations of unprofessional conduct. *Id.* ¶¶ 119; 122. Roberts also exercised this authority when she decided not to conduct an investigation or discipline Gerry based on the complaint. *Id.* Roberts exercised her policymaking authority when she decided not to investigate or discipline Gerry upon his own admission that promiscuous photos of him were taken within the scope of his employment and that he often had sexual encounters with female members who were the targets of his enforcement efforts. *Id.* Roberts additionally made the policy decision to *protect Gerry* by sending the complaint to the SJPD to investigate the individual who complained. *Id* at ¶120. Less than three months later, as a direct and proximate result of the actions taken by Roberts, Gerry continued his unprofessional conduct and violated Plaintiff's constitutional rights by sexually assaulting and extorting her *Id.*

Roberts' actions related to employment decisions of the CED were not reviewable by the City Council. SAN JOSE, CAL., CITY CHARTER § 411 (Neither the Council nor any of its members…shall interfere with the execution by the City Manager of his or her powers and duties, nor in any manner dictate the appointment or removal of any City officers or employees…). *See* Exhibit 2 attached. Additionally, Roberts' actions were not, in practice, overseen by the City Manager as he delegated his final policymaking authority to her. Thus, Roberts' actions were final and unreviewable by those the City argues were the only possible policymakers, making Roberts' actions the final policy. Accordingly, Plaintiff has alleged sufficient facts to establish a plausible claim that the City can be liable under § 1983 based on the actions of final policymaker, Rachel Roberts.

Adopting the City's restrictive view of policy-making authority would both contradict its own clear

PLAINTIFF DAI TRANG THI NGUYEN'S OPPOSITION TO MOTION TO DISMISS CLAIMS

CASE NO.
5:21-CV-00092-EJD

1  municipal organizational plan and also foster a head-in-the-sand defense to obvious liability violating
2  common sense and the constitutional rights of its residents.

3           **b.      Gerry was a *De Facto* Policy Maker as the City's only Massage Code
4                    Enforcement Inspector.**

5          "A municipal employee may act as a *de facto* policymaker under § 1983 without explicit authority
6  under state law, but [courts] are ordinarily 'not justified in assuming that municipal policymaking authority
7  lies somewhere else than where the applicable law purports to put it.'" *Lytle*, 382 F.3d at 982 –83 citing
8  *Praprotnik*, 485 U.S. at 126. Depending on the circumstances, courts may also look to the way a local
9  government entity operates in practice. *Id.* at 983; see also *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737
10 (1989) (trial judge must identify official policymakers based on state and local positive law, as well as custom
11 or usage having the force of law).

12         "When determining whether an individual has final policymaking authority, [courts] ask whether he or
13 she has authority '*in a particular area, or on a particular issue.*' For a person to be a final policymaker, he
14 or she must be in a position of authority such that a final decision by that person may appropriately be
15 attributed to the [municipality]." *Lytle,* 382 F.3d at 983 (internal citations omitted, emphasis in original.) "For
16 example, in *Jett*, the plaintiff contended that he was transferred because of his race. In determining whether
17 a school district superintendent was a final policymaker, the Court focused on the question of whether the
18 superintendent 'possessed final policymaking authority in the area of employee transfers.'" *Id.*; see also *Jett*,
19 491 U.S. at 738. In *Lytle*, the court affirmed the district court's ruling that a school district could be liable
20 under § 1983 for the retaliatory actions taken by the superintendent because they were final policymakers in
21 "the relevant area of policymaking" of "employment-related decisions, particularly employee discipline."
22 *Lytle* 382 F.3d at 983.

23         When the City Council approved the Massage Ordinance, the Council delegated enforcement of the
24 Ordinance, in part, to the CED. *See* SAN JOSE, CAL. MUN. CODE § 6.44.520 attached as Exhibit 3; *see
25 also* Doc. 1 ¶¶ 88, 90, Ex. 7. The Ordinance also granted the Chief of Police authority to make permit and
26 license determinations with respect to massage establishments. *Id.* § 6.44.500, *et al.* The "Chief of Police"
27 includes his or her authorized agents. *Id.* at § 6.44.040, see also *id.* at § 1.04.080.

28         Gerry had final policymaking authority to enforce the Massage Ordinance through the explicit grant of

authority by the City Council to the PBCED, which included the CED. Additionally, Plaintiff has alleged sufficient facts to establish that Gerry was working as an authorized agent of the Police Department. Doc. 1 ¶¶ 26; 105.  As noted above, on September 13, 2017, Chief Garcia formally told the San Jose City Council of his intent for the single code inspector (Gerry) to work "in partnership with the Police Department on massage enforcement." *Id.* In practice, Gerry enforced the massage ordinance on his own with few minor exceptions. *Id.* ¶¶ 96-98. Gerry was given final policymaking authority with regards to the frequency, necessity, timing, and manner of inspections of City businesses offering massage services; the issuance of compliance orders like the one he gave to Plaintiff, citations and exceptions for administrative, building, and other municipal code violations to businesses offering massage services; *de facto* authority over the approval or denial of applications for massage permits; and the ability to directly communicate with massage establishment owners and operators regarding permitting requirements. *Id.* at ¶ 93.

As alleged in the Complaint, Gerry indeed exercised this *de facto* policy making authority with no oversight or consequence. He made exceptions to the Massage Ordinance in exchange for cash and forced sexual favors. Doc. 1. ¶¶ 37-43; 47; 71; 93. His decisions had the force and effect of law, especially to the Asian immigrants he chose to target who could not distinguish him from a police officer. No other municipal or CED employee visited the targeted establishments to check on his recommendations. Each of his decisions was a final policy choice and consistent with his express and unique title of "Code Enforcement Inspector— Massage." Therefore, Plaintiff has also alleged sufficient facts to establish a plausible § 1983 cause of action against the City under the acts of Gerry, a *de facto* policymaker for the City.

Moreover, the City's argument that Gerry cannot be considered a final policymaker because he had supervisors is immaterial. As explained in *Lytle,* the fact that an officer or employee's decision is reviewable is not the determining factor on whether or not the person can be considered a final policymaker. *Lytle,* 382 F.3d at 985. The *Lytle* Court looked to the record, which indicated that the decisions related to the relevant area of policymaking were not in fact reviewed. *Id.* Here, Gerry's actions were not reviewed by his supervisors. He worked largely alone and his supervisors did not go into the field to meet with the public or check on Gerry's work in any way. Doc. 1 ¶ 113. There was also a lack of review of Gerry's written records of enforcement. *Id.* at ¶ 114. Even when there were complaints about his unprofessional behavior and he admitted to engaging in unprofessional behavior while on duty, his supervisors did nothing. *Id.* at ¶¶ 119;

122. Thus, Plaintiff has alleged sufficient facts to establish that Gerry's acted as a final policymaker and that his decisions were not reviewed by supervisors.

### c. The City Council's Express Decision to Devote a Single Code Inspector to Enforce the Mandates of the Massage Ordinance on 5900 Entities and Practitioners Caused the Plaintiff's Constitutional Violations

The City recognizes that the City Council is a final policymaker. Doc. 30 at p.7:7–9; see also SAN JOSE, CAL., CITY CHARTER § 400 ("All powers of the City and the determination of all matters of policy shall be vested in the Council . . . ."). As the City's final policymakers, the Council approved the Massage Ordinance which amended Section 6.44 of the City Municipal Code. Doc. 1 at ¶ 85, Ex. 7.  As noted, the Ordinance gave the PBCED the authority to inspect massage premises. *Id.* at ¶ 88; SAN JOSE, CAL., MUN. CODE § 6.44.520, Doc. 30 at Appx 4.

The Council had actual knowledge of the severe lack of staffing available within the SJPD to enforce the new Massage Ordinance, the Council also had actual knowledge that 5,900 establishments and masseuses fell under the purview of the Ordinance. *Id.* at ¶ 102. Despite this information, the Council approved funding for only one code inspector to conduct massage enforcement operations and chose to eliminate one of the only supervisorial positions over that lone inspector. *Id.* at ¶ 92, Ex. 8.

As city policy-makers, the City Council made a deliberate choice to understaff the regulation of massage businesses despite making its Massage Ordinance a top municipal priority. The understaffing and lack of supervision allowed a single male with a history of unprofessional conduct to rampage through a vulnerable City industry with abandon. As such, the Council's actions directly and proximately caused the deprivation of constitutional rights suffered by Plaintiff, making the City liable under § 1983.

### d. City Policymakers Ratified Gerry's Unconstitutional Acts.

A municipality is subject to Section 1983 liability pursuant to a ratification theory if "authorized policymakers approve a subordinate's decision and the basis for it." *Praprotnik*, 485 U.S. at 127. The *Praprotnik* Court explained, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at. 127. In order to maintain a Section 1983 cause of action on a theory of ratification, the plaintiff must show that "an official

policymaker [made] a deliberate choice from among various alternatives to follow a particular course of apction." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) citing to *Pembaur*, 475 U.S. at 483–84.

A supervisor ratifies her subordinate's conduct by failing to investigate and discipline him in the face of information which supports an inference of unconstitutional conduct. *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (Evidence sufficient to find policy-maker police chief ratified officers' unreasonable searches when he failed to adequately investigate their misconduct because he fostered a feeling 'they could get away with anything'); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093-1094 (9th Cir. 1998) (City of Oakland and Police Chief potentially liable for ratifying pattern of excessive force by canine officer when prior allegations against officer not properly investigated); *Nelson v. City of Davis*, 709 F.Supp.2d 978 (9th Cir. 2010) (Evidence sufficient to find Davis Police Chief ratified officers' excessive force in the use of "pepperballs" when chief failed to properly investigate student claims of misconduct).

Here, Plaintiff has alleged facts sufficient to hold the City liable based on its policymakers' ratification of Gerry's unconstitutional acts. As shown above, Rachel Roberts—who was then serving as both Gerry's supervisor and the Acting Head of the CED—was a final policy-maker. In that capacity, Roberts ratified Gerry's unconstitutional acts by failing to investigate any of the four complaints alleging misconduct at the CEO Spa, including the two naming Gerry specifically. It is difficult to understate the level of indifference displayed by Ms. Roberts when she received a letter specifically stating that Gerry was having intercourse and receiving unlawful payments in apparent exchange for a permit—allegations supported by photographic evidence—and then failed to confront the problem.

Roberts' forwarding of the letter to the SJPD does not save the City. Roberts—perhaps to protect her employee and her Department's reputation—asked the SJPD to investigate the letter's *author. Id.* at ¶ 120. Attempting to shift blame to the whistleblower while accepting Gerry's absurd justification constituted ratification of Gerry's constitutional violations.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the City's Motion to Dismiss. Alternatively, if the Court believes Plaintiff has not met the standards required for a constitutional claim of municipal liability, Plaintiff respectfully request she be granted leave of court to amend her complaint in compliance with the federal rules. As briefly referenced above, Plaintiff has additional

1   information pertaining to the City's knowledge and inaction regarding Gerry's "regulation" of the massage

2   businesses *before Plaintiff was raped, attacked and extorted.*

3

4   Dated: April 12, 2021

5                                           MURPHY, PEARSON, BRADLEY & FEENEY

6

7                                   By    /s/ *Philip J. Kearney*
                                          Philip J. Kearney
8                                         Christopher R. Ulrich
                                          Kevin D. Cardona
9                                         Alexandrea M. Tomp
                                          Attorneys for Plaintiff
10                                        DAI TRANG THI NGUYEN

11

12  PJK.3949582.docx

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 24 -

# EXHIBIT 1

3.04.470 - Changes in powers, duties and responsibilities of a position.

    A.  Changes in duties, responsibilities and functions of a position can be made by the city manager or the head of the department in which the position is located, subject to any limitations established by Charter or the council.

    B.  If and when the general duties, responsibilities and functions of a position are substantially and permanently changed, the head of the department in which the position is located shall report the change to the director. The director will then determine if reallocation is warranted.

    C.  A change in specific functions, responsibilities, duties or work assigned to a holder of a particular position shall not be considered substantial if the new functions still fall within, or are covered by, the class specifications of the class to which the position is currently allocated.

(Prior code § 2003.3; Ord. 26850.)

# EXHIBIT 2

(e)     NO REMAINING MEMBERS.  If the offices of all of the Council members and also of the Mayor should become vacant and no member of the Council remains to fill any vacancies, the City Clerk shall call and conduct a Special Municipal Election, as soon as reasonably possible, to fill such offices for the remainder of the unexpired terms.

(f)     ELECTION DATES.  All dates for elections to fill vacancies shall be set by resolution.

(g)     ELECTION IN 1994.  The election held on November 8, 1994 to fill a vacancy effective January 1, 1995 in Council District 7 shall be deemed to be an election
pursuant to this Section.  The person so elected shall serve for the full term of that office.

*Amended at election June 6, 1967*
*Amended at election June 6, 1972*
*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

## SECTION 411.  The Council; Interference With Administrative Matters.

Neither the Council nor any of its members nor the Mayor shall interfere with the execution by the City Manager of his or her powers and duties, nor in any manner dictate the appointment or removal of any City officers or employees whom the City Manager is empowered to appoint except as expressly provided in Section 411.1.  However, the Council may express its views and fully and freely discuss with the City Manager anything pertaining to the appointment and removal of such officers and employees.

Except for the purpose of inquiries and investigations under Section 416, the Council, its members and the Mayor shall deal with City officers and employees who are subject to the direction and supervision of the City Manager, City Attorney, City Auditor, Independent Police Auditor or City Clerk, solely through the City Manager, City Attorney, City Auditor, Independent Police Auditor or City Clerk, respectively, and neither the Council nor its members nor the Mayor shall give orders to any subordinate officer or employee, either publicly or privately.

*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

## SECTION 411.1  Department Heads; Policy Objectives; Consent to Hire.

(a)     The Council shall adopt a written Statement of Policy for each City Department which is under the administration of the City Manager.  Said Statement of Policy shall set forth the broad goals, objectives and aspirations to be accomplished by that Department.

# EXHIBIT 3

6.44.040 - Chief of police.

"Chief of police" means the chief of police of the City of San José or his or her authorized agents.

(Ord. 29662.)