UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DAI TRANG THI NGUYEN,

Plaintiff,

v.

CITY OF SAN JOSE, et al.,

Defendants.

Case No.   5:21-cv-00092-EJD

**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

Re: ECF No. 70

Before the Court is Defendants' Motion to Dismiss the First Amended Complaint under Rule 12(b)(6) based on municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  ECF No. 70 ("MTD").  The Court heard oral arguments on March 9, 2023.  Having considered the parties' written submissions and arguments made at the hearing, the Court GRANTS the motion with leave to amend.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Dai Trang Thi Nguyen brings this action against Defendant the City of San Jose (the "City") and individual Defendants William Gerry, Joseph Hatfield, Rachel Roberts, Edgardo Garcia, and Does 1-100's (collectively, "Defendants") for violation of her Fourteenth Amendment rights to due process and equal protection under 42 U.S.C. § 1983.  *See generally*, ECF No. 60 ("FAC").

#### 1.    The Code Enforcement Division

In 2007, the City hired Defendant Gerry as a Code Enforcement Inspector in its Code Enforcement Division.  *Id.* ¶ 28.  Defendants Hatfield and Roberts supervised the Code

United States District Court
Northern District of California

1    Enforcement Division.  *Id.* ¶¶ 20–21, 28.  Hatfield and Robert's duties included training,

2    supervising, auditing, investigating, and disciplining Gerry.  *Id.* ¶ 20.

3          The purpose of the Code Enforcement Division was to correct municipal code violations,

4    which included inspection of massage establishments.  *Id.* ¶ 29.  Many of the massage

5    establishments were owned and/or employed by immigrant women born in Asia with low levels of

6    education.  *Id.* ¶ 31.  For this reason, enforcement officers were prohibited from entering a

7    massage business alone and unsupervised for many years.  *Id.* ¶ 32.  Starting around 2011 or

8    earlier, however, the City permitted Gerry and other male code enforcement officers to conduct

9    solo, unsupervised inspections of massage establishments.[1]  *Id.* ¶ 5.

### 2.    The Massage Ordinance

11         In December 2015, City Council approved Ordinance No. 29662 (the "Massage

12   Ordinance") which amended Section 6.44 of the City Municipal Code.  *Id.* ¶ 36.  The City's

13   Massage ordinance took effect on January 15, 2016.  *Id.*  The Massage Ordinance was passed, in

14   part, to increase oversight of massage establishments because they were particularly susceptible to

15   human trafficking and prostitution.  *Id.* ¶ 36.  The Massage Ordinance required massage

16   establishments, in relevant part, to: (1) maintain valid business permits issued by the Chief of

17   Police; (2) maintain valid ownership/management licenses also issued by the Chief; and (3) ensure

18   that individual masseuses be certified as massage therapists.  *Id.* ¶ 37.

19         At the time that the Massage Ordinance passed, there were purportedly anywhere from 300

20   to 5,300 massage establishments and/or licensed establishments offering massage services—all of

21   which fell under the gambit of the new ordinance.  *Id.* ¶ 38.  Chief Garcia informed the City that

22   the SJDP lacked sufficient resources to enforce the new law.  *Id.*  As a result, the Code

23   Enforcement Division partnered with the San Jose Police Department ("SJPD") to assist with the

24   enforcement of the Massage Ordinance.  *Id.* ¶ 22.  In 2017, Gerry was assigned to be the

---

[1] The FAC adds a footnote which suggests that unsupervised code inspections were common starting as early as 2006: "City records show that from 2006 through 2016—the decade before the effective date of the Massage Ordinance—124 of the 158 massage enforcement visits (78%) in the City were conducted by solo male code inspectors."  FAC ¶ 7, n.1.

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND
2

Division's sole enforcement inspector of massage establishments.  *Id.* ¶ 40.  Defendant Chief Garcia oversaw training, supervision, auditing, investigation, and discipline of Gerry when he was supporting and partnering with the SJPD's Vice Unit.  *Id.* ¶ 22.

Gerry worked as the enforcement inspector of massage establishments for nearly nine years.  During this time, he conducted over 700 Massage ordinance enforcement visits at massage establishments.  *Id.* ¶ 41.  City records indicate that Gerry was alone—meaning, he was not accompanied by another inspector or supervisor—on all but five of these inspections.  *Id.* Defendant Hatfield, Gerry's unit supervisor, attended only two of Gerry's enforcement actions. *Id.* ¶ 41.  Division records also show that Defendant Roberts, Gerry's other immediate supervisor, never visited a massage business to monitor his work.  *Id.*

The City Defendants instructed the SJPD's Vice Unit to partner and coordinate with Gerry when its officers conducted criminal raids on massage businesses.  *Id.* ¶ 42.  Gerry received alerts of planned raids of massage establishments and, as a matter of routine, attended and participated in the raids.  *Id.*  Gerry was also tasked with notifying the SJPD of criminal conduct he observed while inspecting massage establishments for code violations.  *Id.*

### 3.    Complaints About Gerry's Conduct

Shortly after Gerry began acting as the sole enforcement inspector of massage establishments, on October 25, 2018, Defendant Roberts in the Code Enforcement Division received an anonymous letter addressed to Gerry that included photos of Gerry in a close embrace with an Asian woman who was later identified as an employee of a massage establishment that Gerry had inspected.  *Id.* ¶¶ 43, 44; *see* Ex. 4.  The letter threatened to publicize the photos of Gerry and the fact that he was having intimate relationship with the woman pictured unless Gerry closed a competitor's massage business.  *Id.*  Defendant Roberts gave the letter to the SJPD to conduct a criminal investigation to discover the anonymous letter's author.  *Id.* ¶ 46.  Plaintiff alleges that the department did not investigate the allegations against Gerry.  *Id.*

A couple months later, on December 16, 2018, the City's "Whistleblower Hotline" received an anonymous email from a female owner of a massage establishment accusing Gerry of

preying on female Asian massage workers. *Id.* ¶ 47.  According to the email, Gerry twice came to the author's business while she was attempting to obtain a permit and misused his authority to sexually assault her and to propose *quid pro quo* arrangements.  *Id.*  The arrangements involved exchanging sex and/or money for the issuance of massage permits.  *Id.*  The email also stated that Gerry accepted bribes in exchange for issuing permits to other massage businesses that engaged in the illicit sex trade.  *Id.*  The email states, in part, that:

> William Gerry is doing Code Enforcement for Massage businesses. He is violating city code of ethics and taking advantage of the fear people in the Asian community have of the government and police. He crossed the line several times when speaking with me, and I've heard from other owners similar stories. Here is what happened to me -I submitted all paperwork for a massage permit -On two different occasions William came to my store. My first encounter he came in, said who he was, and grabbed mv hands to hold them to speak with me. This made me feel very uncomfortable and not professional. He also touched me several times on the shoulder and back with a rubbing and squeezing motion He was there for an hour talking about personal things and very little business. He said it was ok for me to remain open during the permit process (later I found out this is not true and he should have told me to close during the process). The second time he came to the store he immediately started touching me again. He then asked to go to back room to talk. In the backroom he repeatedly asked for me to give him a massage even though I told him I don't do that. He said he would help me open as many stores as I want if I take care of him. He also told me a woman I had working for me was bad and I should fire her. He repeated that I could keep store open until I get permit. He again was there for about an hour. I felt very uncomfortable, afraid, and that he is not acting like professional city representative. I have photos and video (no audio unfortunately) of him touching me repeatedly. I have heard from other massage owners that he asked for free massages. I also heard from some owners that did get their permit (even though they are known for being the bad kind of massage store the city is trying to get rid of), that they gave him envelope of money. This is common in China to pay government officials for favors, I didn't think it was acceptable in the USA. I encourage you to do a thorough investigation of William Gerry. As a tax payer and USA citizen, it makes me sad that someone like him is taking advantage of immigrants through fear, unwanted sexual advances, and bribes. Thank you for listening.

*Id.*; Ex. 5.  The email was reviewed by a Senior Executive Analyst within the City's Office of Employee Relations and forwarded to the SJPD.  *Id.* ¶ 48.   Plaintiff alleges that Defendants Garcia, Roberts, and Hatfield had knowledge of the whistleblower's email.  *Id.*

After receiving the whistleblower email, Defendants allegedly received two additional

United States District Court
Northern District of California

complaints against Gerry for similar conduct.  *Id.* ¶ 49.

### 4.     Gerry's Predatory Conduct Towards Plaintiff

Plaintiff is a naturalized United States citizen of Vietnamese descent who speaks limited English.  *Id.* ¶ 57.  Plaintiff was a licensed massage therapist who owned and operated "Soft Touch Spa" (the "Spa") in San Jose during the time that Gerry was the sole inspector of massage establishments.  *Id.* ¶¶ 58, 59.  The Spa was located on leased commercial property.  *Id.* ¶ 59.

On December 20, 2018, Gerry issued a "Compliance Order" on Code Enforcement Division letterhead to the owner of Soft Touch Spa.  *Id.* ¶ 60.  The order notified the owner that the Spa was operating without the permit and license required by the Massage Ordinance. *Id.*  It instructed all massage operations at the Spa to cease immediately.  *Id.*  Plaintiff's landlord discovered the order and notified Plaintiff.  *Id.*

On January 8, 2019, Gerry visited the Spa for the first time.  *Id.* ¶ 61.  During this visit he was on-duty, wearing a visible City identification badge clipped to his belt and driving a white City of San Jose sport utility vehicle bearing San Jose municipal decals on its doors.  *Id.*  Gerry told two female employees at that Spa that he had a massage permit application package for the Spa's owner.  *Id.*  Gerry was informed that Plaintiff was not at the Spa.  *Id.*  Gerry proceeded to sit in between the two female employees on the couch and massaged each woman's back under their blouses before leaving.  *Id.*

Gerry returned to the Spa the next morning.  *Id.* ¶ 62.  He again wore his badge and drove the City of San Jose sport utility vehicle.  *Id.*  Based on his vehicle and badge, Plaintiff believed Gerry to be an SJPD officer.  *Id.*  Gerry inspected the premises and identified what he described as unpermitted construction in the Spa that was not shown on City building plans.  *Id.*  Gerry told Plaintiff that cost of construction to bring the Spa into compliance would exceed $50,000.  *Id.*  After the inspection, Gerry asked to speak to Plaintiff privately.  *Id.*  Plaintiff believed that Gerry wished to discuss the inspection and permit process further.  *Id.*  Instead, once in a private room, Gerry asked to see the tattoo on Plaintiff's back that was partially exposed under her outer garments.  *Id.*  Believing that Gerry was a police officer, Plaintiff complied and lifted her blouse,

revealing the tattoo. *Id.* Afterwards, Gerry gave Plaintiff a permit application packet. *Id.* Based on other statements Gerry made during his visit, Plaintiff believed that if she did not cooperate with Gerry then he would close her Spa. *Id.* Gerry then told Plaintiff that she could keep her Spa open if she paid him an upfront fee of $10,000 in cash, followed by monthly payments of $2,000. *Id.* Plaintiff believed that making these payments meant that she did not need to comply with City code requirements. *Id.*

On January 10, 2019, Gerry returned to the Spa before it opened for business to collect his first extortion payment of $10,000. *Id.* ¶ 63. Gerry extorted $10,000 from Plaintiff and forced her to perform oral sex on him. *Id.* The next day, January 11, 2019, Gerry contacted Plaintiff and warned her to keep her Spa closed on January 14, 2019 because the SJPD was scheduled to conduct an inspection of her establishment. *Id.* ¶ 64. Gerry knew this information based on an insider tip he received from the Vice Unit. *Id.*

Gerry returned to the Spa on three more occasions—February 1, February 20, and February 27—to extort Plaintiff for $2,000, $20,000, and $2,000, respectively, and force her to perform oral sex on him. *Id.* ¶¶ 65, 67–68, 70. In total, Gerry extorted $34,000 from Plaintiff. *Id.* ¶ 88. Gerry had told Plaintiff that in exchange for $20,000 in cash he would arrange for the Spa to remain open for three years without being inspected. *Id.* ¶ 67. On February 26, 2019, after Plaintiff paid the $20,000, Gerry texted Plaintiff to warn her of a planned undercover SJPD "sting" planned for later that day at her Spa. *Id.* ¶ 69.

On March 19, 2019, Gerry told Plaintiff that he would come to her Spa the next day to take photographs for her massage permit. *Id.* ¶ 71. He falsely promised Plaintiff that he would get her the permit by April 15, 2019, and also remove her business's name from the list of City massage establishments to be inspected. *Id.* On March 20, 2019, Gerry arrived to take pictures while one of Plaintiff's employees was present. *Id.* ¶ 72. He left but returned to the Spa later that day and raped Plaintiff. *Id.* Plaintiff never saw or heard from Gerry after this final encounter. *Id.* ¶ 73.

Then, on June 2, 2019, the SJPD notified Plaintiff's landlord that the Spa would have to close because of her failure to obtain proper licenses and permits. *Id.* ¶ 80. On June 28, 2019,

Plaintiff and her counsel met with the SJPD's Vice Unit and informed the SJPD about Gerry's extortions. *Id.* ¶ 81. On September 15, 2019, Plaintiff was forced to shut down her business. *Id.*

In July 2020, Plaintiff went to the Kaiser Permanente Hospital to receive treatment for her mental distress caused by Gerry's extortion and sexual assault. *Id.* ¶ 83. She was transferred to Valley Medical Center, Emergency Psychiatric Services ("EPS") for continued protective monitoring. *Id.* ¶ 84. EPS informed the police that a patient at their facility had been the victim of a sexual crime. *Id.* ¶ 83. The SJPD interviewed Plaintiff and began investigating Gerry. *Id.* ¶ 84.

### 5.    The Aftermath

Unbeknownst to Plaintiff, shortly after Gerry's final encounter with Plaintiff, Gerry had resigned from the City's employment in mid-2019 and moved to Texas. *Id.* ¶ 74.

Following the investigation, Gerry was arrested, and, on September 29, 2020, a criminal complaint was filed against Gerry asserting fourteen felony counts, including the sexual and economic crimes committed against Plaintiff. *Id.* ¶ 77. The SJPD's investigation also revealed that Gerry committed sex and extortive crimes under the color of his authority against the owners of two other massage businesses. *Id.* On May 22, 2022, Gerry was sentenced to thirty-five years in state prison after pleading guilty to ten felony offenses stemming from his misconduct. *Id.* ¶ 85.

On May 23, 2022, Mayor Sam Liccardo gave a press conference where he addressed Gerry's crimes and another officer's criminal conduct of a predatory nature, stating that it "was particularly disconcerting . . . that in each case city employees continued to serve in public facing roles [] after someone in the city became aware of the nature of this conduct." *Id.* ¶ 55. He further recognized that "all that information was immediately available, in some cases anonymous complaints and so forth" such that the City "at least had some information about the seriousness of conduct and individuals continued to serve in pubic facing roles where members of the public would be subjected to harm and risk of harm." *Id.*

### B.    Procedural History

This case was stayed pending resolution of the ongoing criminal case against Defendant Gerry in the Superior Court for the County of Santa Clara. The stay was lifted on October 6,

1    2022.  *See* ECF No. 61.

2        Defendants moved to dismiss the complaint before the stay was entered.  While the stay

3    was in place, the Court granted Defendants' motion with leave to amend.  *See* ECF No. 52 ("First

4    Order").  The First Order found that Plaintiff failed to state a claim for *Monell* liability based on a

5    custom or practice of unsupervised solo code enforcement inspections.  *Id.* at 17.  The Court

6    expressed no opinions on whether the facts stated a claim for supervisory liability because

7    Plaintiff had not asserted claims against Gerry's supervisors, Roberts and Hatfield, or any other

8    supervisor in their individual capacity for supervisory liability.  *Id.*

9        Plaintiff filed the FAC on October 6, 2022, adding claims against Roberts, Hatfield, or

10   other supervisors in their individual capacity for supervisory liability.  The FAC asserts two causes

11   of action: (1) deprivation of her Fourteenth Amendment substantive due process rights to bodily

12   integrity and property interest in her business and equal protection of the laws as an Asian female

13   massage business owner in violation of 42 U.S.C. § 1983, against all Defendants; and (2)

14   municipal liability for the foregoing civil rights violations against the City.  *See generally*, FAC.

15   **II.    LEGAL STANDARD**

16       Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with enough

17   specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which

18   it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted).  A complaint

19   which falls short of the Rule 8(a) standard may therefore be dismissed if it fails to state a claim

20   upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "Dismissal under Rule 12(b)(6) is

21   appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support

22   a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th

23   Cir. 2008).  When deciding whether to grant a motion to dismiss, the Court must accept as true all

24   "well pleaded factual allegations" and determine whether the allegations "plausibly give rise to an

25   entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The Court must also construe

26   the alleged facts in the light most favorable to the plaintiff.  *Love v. United States*, 915 F.2d 1242,

27   1245 (9th Cir. 1989).  While a complaint need not contain detailed factual allegations, it "must

28   Case No.: 5:21-cv-00092-EJD

*United States District Court*
*Northern District of California*

1    contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

2    face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

3         A court generally may not consider any material beyond the pleadings when ruling on a

4    Rule 12(b)(6) motion. If matters outside the pleadings are considered, "the motion must be treated

5    as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  However, documents

6    appended to the complaint, incorporated by reference in the complaint, or which properly are the

7    subject of judicial notice may be considered along with the complaint when deciding a Rule

8    12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Hal*

9    *Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

10   Likewise, a court may consider matters that are "capable of accurate and ready determination by

11   resort to sources whose accuracy cannot reasonably be questioned." *Roca v. Wells Fargo Bank,*

12   *N.A.*, No. 15-cv-02147-KAW, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016) (quoting Fed. R.

13   Evid. 201(b)).

## III.    DISCUSSION

### A.    Claims Against City of San Jose

#### 1.    *Monell* Municipal Liability

17        Title 42 of the United States Code Section 1983 provides a cause of action against any

18   "person" who, under color of law, deprives any other person of rights, privileges, or immunities

19   secured by the Constitution of the United States.  *Monell*, 436 U.S. at 694.  Although a

20   municipality qualifies as a "person" under § 1983, a municipality cannot "be held liable under §

21   1983 on a *respondeat superior* theory." *Id.* at 691.  However, "liability may attach where the

22   municipality *itself* causes the constitutional violation through the execution of an official policy,

23   practice or custom." *Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002) (emphasis in original).

24   A *Monell* claim for § 1983 liability against a public entity may be stated in one of three

25   circumstances: 1) a municipal employee committed the alleged constitutional violation "pursuant

26   to a formal governmental policy or longstanding practice or custom which constitutes the standard

27   operating procedure of the local governmental entity;" 2) the individual who committed the

28   Case No.: 5:21-cv-00092-EJD
     ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

1  constitutional violation was an official with "final policy-making authority and that the challenged

2  action itself thus constituted an act of official government policy;" or 3) the plaintiff may

3  demonstrate that "an official with final policy-making authority ratified a subordinate's

4  unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346

5  (9th Cir. 1992).

6           At issue in this case is the first prong.  In the absence of an express official policy, a

7  plaintiff may allege municipal liability through a custom or practice.  42 U.S.C. § 1983; *City of St.*

8  *Louis v. Praprotnik*, 485 U.S. 485 U.S. 112, 127 (1988).  A municipal's policy may be one of

9  action or inaction: "A policy of action is one in which the government body itself violates

10  someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on

11  a government body's failure to implement procedural safeguards to prevent constitutional

12  violations." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quotations and citation

13  omitted).  Thus, a municipal entity may be liable under § 1983 for inaction, namely, a policy or

14  custom of inadequate training, supervision, or discipline its employees.  *City of Canton, Ohio v.*

15  *Harris*, 489 U.S. 378, 387 (1989); *see Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir.

16  1989).

17           However, it is not enough for a plaintiff to identify a local government's custom or policy

18  that caused his injury; plaintiff must also demonstrate "that the custom or policy was adhered to

19  with 'deliberate indifference to the constitutional rights of [plaintiff].'" *Castro v. Cnty. of Los*

20  *Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (citing *Canton*, 489 U.S. at 392.  Liability attaches

21  to a claim that arises under failure to supervise or train only where the failure to train or supervise

22  "amounts to a 'deliberate' or 'conscious' choice" by a government entity.  *Flores v. Cnty. of Los*

23  *Angeles*, 758 F.3d 1158 (9th Cir. 2014).  The inquiry is whether the training or supervision is

24  adequate, "and if it is not, the question becomes whether such inadequate training [or supervision]

25  can justifiably be said to represent city policy." *Canton*, 489 U.S. 378 at 390; *see also Dougherty*

26  *v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("[A] failure to supervise that is sufficiently

27  inadequate may amount to deliberate indifference.") (quotations and citation omitted).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### a.      Custom or Practice of Unsupervised Solo Code Enforcement

Plaintiff alleges that the City had a custom or practice of unsupervised code enforcement by a solo male inspector.  The First Order found that Plaintiff failed to state a claim for *Monell* liability based on a custom or practice of unsupervised solo code enforcement inspections because as pled the Undersigned could not plausibly infer a custom or practice from one employee's activities for two years.  First Order at 13.

Plaintiff has addressed the Court's concerns in part by bolstering its allegations regarding the Code Enforcement Division's practice of using unsupervised code enforcement by a solo male inspector in the San Jose massage industry.  For example, Plaintiff alleges that in the years prior to Gerry's assignment as sole code enforcer of all massage establishments—from 2006 to 2016— City records indicate that 124 out of 158 additional massage enforcement visits by other code enforcers besides Gerry were also conducted by solo male code inspectors.  FAC ¶ 7 n.1.  The FAC also alleges that Gerry conducted over 700 solo and unsupervised code inspections during the nine-year period that he worked for the Code Enforcement Division.  *Id.* ¶ 41.

Identifying a custom or policy is only the first step, however; Plaintiff must also establish that the practice of using solo male code enforcement of the massage industry "was adhered to with deliberate indifference to the constitutional rights" of Plaintiff and other similarly situated women working in the massage industry as pled.  Plaintiff asserts that the City's practice of using solo male code enforcement of the massage industry shows a reckless and callous indifference to Plaintiff's rights.  FAC ¶¶ 40–41, 87–90.  For the reasons discussed below, Plaintiff's theory fails at this inquiry.

### i.      Deliberate Indifference

A showing of deliberate indifference requires both notice and causation.  First, a plaintiff to show that defendant "was on actual or constructive notice that its omission would likely result in a constitutional violation."  *Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1145 (9th Cir. 2012).  Second, a plaintiff must plead a sufficient causal connection between "the alleged deficiency in supervision and training actually caused the requisite indifference."  *Pergamensch v. Novato*

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND
11

1    *Police Dep't*, No. 06-CV-6659-PJH, 2007 WL 2177678, at *6 (N.D. Cal. July 27, 2007) (citing

2    *Canton*, 489 U.S. at 391).  This heightened inquiry is to avoid running afoul of *Monell*; otherwise,

3    "it could always be alleged that the municipality failed to enact a policy that would have prevented

4    the tort."  *Tsao*, 698 F.3d at 1143–44.

5        First, Plaintiff alleges that Defendants were on actual or constructive notice of the risk that

6    the City's practice of using solo male code enforcement of the massage industry would result in

7    constitutional violations.  Plaintiff alleges three "categories" of notice: 1) law enforcement experts

8    have cautioned against allowing code enforcement officers to inspect a massage establishment

9    alone because of the risk of exploitation of vulnerable women working in the industry, FAC ¶ 4;

10   and 2) the City enacted the Massage Ordinance imposing new licensing, permitting, and code

11   requirements on massage businesses in part to address and prevent sex work and human

12   trafficking within the massage industry, *id.* ¶ 6; and (3) anonymous complaints about Gerry's

13   conduct.  Opp'n at 19.  The Court addresses each argument in turn.

14        The FAC contains only one allegation that law enforcement experts have instructed local

15   agencies to never allow code enforcement officers to visit a massage establishment alone.  FAC ¶

16   4 ("[L]aw enforcement experts have for years instructed local agencies that an enforcement officer

17   must never be allowed to go into a massage business by himself, lest he exploit the vulnerable

18   women inside.").  Such a broad, unsupported allegation lacks sufficient detail for the Court to

19   plausibly infer that the practice of using solo male code enforcement of the massage industry is

20   widely discouraged by law enforcement and/or experts in the field because it could likely result in

21   constitutional violations.[2]  Plaintiff cites one source in support, the 2017 Human Trafficking Task

22   Force Report, describing the presence and impact of human trafficking on the massage industry.

23

24   [2] Plaintiff's argument relies on *Vann*, which notes that "[d]eliberate indifference may also be
25   shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated."  *Vann v. City of New*
26   *York*, 72 F.3d 1040, 1049 (2d Cir. 1995).  Although Plaintiff need not solicit expert testimony at the pleading stage, in *Vann*'s own words, Plaintiff must still establish that "the need for more or
27   better supervision to protect against constitutional violations was *obvious*."  *Id.* (emphasis added).

*Id.* ¶ 31. Aside from the report, the FAC broadly alleges that Defendants knew that most people working in the massage industry were Asian immigrant women with low levels of education who were particularly vulnerable to exploitation, and that Defendants knew that human trafficking is widespread in the massage industry. FAC ¶ 31. According to Plaintiff, Defendants therefore knew or should have known that regulation of the massage industry "had to be done in a way so that no City employee could easily abuse his enforcement powers to exploit the vulnerable women working in this industry." *Id.* ¶ 32. However, the fact that human trafficking is prevalent in the massage industry does not put Defendants on notice that unsupervised, solo male Code Inspectors are likely to extort and sexually assault massage business owners and masseuses.

For these same reasons, the passage of the Massage Ordinance also does not establish actual or constructive knowledge. Plaintiff alleges that the Massage Ordinance was passed "to combat prostitution and human trafficking within the City's massage industry." FAC ¶ 6. For the reasons already explained, the fact that the Massage Ordinance was passed for this purpose does not put Defendants on notice that Gerry would violate Plaintiff's constitutional rights. The Court therefore cannot say that the City made a deliberate choice to "countenance the possibility of a constitutional violation." *Tsao*, 698 F.3d at 1145.

As to the anonymous complaints about Gerry's conduct, in the First Order the Court agreed that the whistleblower complaint clearly asserts that Gerry was demanding bribes and sexually assaulting business owners. *See* First Order at 19. However, even if Plaintiff shows that Defendants had actual or constructive knowledge, Plaintiff must also demonstrate that the lack of supervision "actually caused the constitutional harm or deprivation of rights." *Flores*, 758 F.3d at 1159. In this case, Plaintiff must allege facts to show that Defendants "disregarded the known or obvious consequence" that the practice of using solo male code enforcement of the massage industry "would cause [municipal] employees to violate citizens' constitutional rights." *Id.* (alteration in original).

Here, the causal connection is attenuated. Even if the City had known that workers in the massage industry are primarily Asian immigrant women who are vulnerable to human trafficking,

United States District Court
Northern District of California

1    Plaintiff has not shown that this information would have alerted the City to the likelihood that

2    Code Inspectors would extort and sexually abuse massage business owners and masseuses during

3    solo code enforcement inspections and prevented the violation of Plaintiff's rights.  The

4    unconstitutional consequences of the policy must be "so patently obvious that a city could be

5    liable under 1983 without proof of a pre-existing pattern of violations." *Flores*, 758 F.3d at 1159;

6    *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (explaining that "the need for more

7    or better supervision to protect against constitutional violations . . . . may be demonstrated through

8    proof of repeated complaints of civil rights violations.").  The *Flores* court concluded that the

9    unconstitutional consequences of failing to train police officers not to commit sexual assault are

10   not "so patently obvious" that defendants "were deliberately indifferent." *Flores*, 758 F.3d at

11   1160.  The same can be said for the City's practice of using solo male code enforcement of the

12   massage industry because "everyone is presumed to know the law" with respect to the "criminal

13   prohibition on sexual assault." *Id.*

14          Nor has Plaintiff shown a pattern or history of sexual abuse during solo male Code

15   Inspector visits.  *See id.* at 1159 (noting that plaintiff did not allege a pattern of sexual assaults

16   perpetrated by sheriff's deputies before her alleged assault); *Manda v. Albin*, No. 5:19-CV-01947-

17   EJD, 2019 WL 6311380, at *8 (N.D. Cal. Nov. 25, 2019) ("a failure to supervise generally gives

18   rise to § 1983 liability in situations where 'there is a history of widespread abuse.'") (quoting

19   *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).  Notably absent from the FAC is any

20   allegation that other Code Inspectors engaged in similar kinds of illegal activities while on duty.

21   The fact that other male Code Inspectors inspected massage businesses alone for years without

22   engaging in similar conduct is at odds with Plaintiff's argument that there was an obvious need for

23   more supervision to protect against constitutional violations by solo male Code Inspectors.  *See*

24   *Tsao*, 698 F.3d at 1145.  Plaintiff's custom or practice argument is still based on Gerry's acts, and

25   "[a] single act or isolated incidents" are generally insufficient to establish a failure to supervise.

26   *Wellington*, 717 F.2d at 936; *Monell*, 436 U.S. at 694 ("[A] local government may not be sued

27   under § 1983 for an injury inflicted solely by its employees or agents . . . . it is when execution of

28   Case No.: 5:21-cv-00092-EJD

1  a government's policy or custom . . . . inflicts the injury that the government as an entity is

2  responsible under § 1983).

3      Thus, Plaintiff has failed to establish that she "suffered a constitutional injury *by the City*,"

4  and a constitutional deprivation suffered as a result of an official policy is "the touchstone of §

5  1983 liability." *Fairley*, 281 F.3d at 917 (emphasis in original).  Accordingly, as pled, Plaintiff

6  has not stated a claim for *Monell* liability based on a custom or practice of unsupervised solo code

7  enforcement inspections and/or failure to supervise.

8              **2.       Vicarious Liability**

9      Plaintiff's second cause of action asserts that the City is vicariously liable to plaintiff for

10 her injuries resulting from Gerry's sexual assault pursuant to California Government Code Section

11 815.2.  FAC ¶¶ 92–93.

12     Section 815.2(a) imposes vicarious liability on a public entity for the acts and omissions of

13 government employees acting in the course and scope of their employment unless the employee

14 successfully asserts statutory immunity as provided in § 815.2(b).  Cal. Gov't Code § 815.2.  The

15 primary inquiry under § 815.2 is "whether the risk was one that may fairly be regarded as typical

16 of or broadly incidental to the enterprise undertaken by the employer," in which case "the

17 employer's liability extends beyond his actual or possible control of the employee to include risks

18 inherent in or created by the enterprise."  *Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962,

19 964 (1986).

20     Plaintiff relies on the doctrine articulated in *Mary M. v. City of Los Angeles*, which carves

21 out a narrow exception to § 815.2 by recognizing that an on-duty law enforcement officers who

22 misuse official authority by committing a sexual assault may be acting within the scope of their

23 employment.  Cal. 3d 202, 208 (1991).  In *Mary M.*, California Supreme Court stated three

24 reasons for applying the doctrine of *respondeat superior* under these circumstances: "(1) to

25 prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the

26 victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from

27 the enterprise that gave rise to the injury."  *Mary M.*, 54 Cal. 3d 202, 209 (1991).  In doing so, the

28 Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

court held that a public entity may be vicariously liable for a sexual assault committed by a police officer where the assault "arose from misuse of official authority," which, in such cases, is a question for the jury to determine.  *Id.*

Plaintiff asserts that a Code Inspector is a peace officer "akin to a law enforcement officer" because he had a badge, drove a marked, city-endorsed vehicle, often accompanied the Vice Unit on raids, and was vested with the power of citation issuance and arrest in limited circumstances. Opp'n at 21–22.  Thus, Plaintiff contends that vicarious liability attached to Gerry's sexual misconduct committed during the scope of his employment as a Code Inspector.  *Id.* at 21.

However, § 1983 does not authorize Plaintiff to impose vicarious liability on the City under state law.[3]  *See Moor v. Cnty. of Alameda*, 411 U.S. 693 (1973).  Plaintiff asserts a federal cause of action against the City under § 1983 and that the City is vicariously liable under California law for the acts of its Code Inspector, Gerry, which violated the Federal Civil Rights Act; in effect, Plaintiff seeks to establish a federal cause of action against the City on the basis of California law.  But permitting vicarious liability under § 815.2 would "achieve a result which could not be reached through section 1983 . . . . [and] the result would be inconsistent with the laws of the United States."  *Moor v. Madigan*, 458 F.2d 1217, 1220 (9th Cir. 1972), *aff'd in part, rev'd in part sub nom. Moor v. Cnty. of Alameda.*, 411 U.S. 693 (1973).  The law is clear that "the municipal liability created by California under section 815.2(a) did not expand the remedies

---

[3] As the Second circuit has explained:

> [T]he scope of municipal liability under the federal cause of action created by § 1983 is a federal question. Just as states cannot extinguish municipality liability under § 1983 via state law, they cannot enlarge it either. As the Supreme Court discussed in *Monell,* Congress chose not to impose a federal law of *respondeat superior* . . . . A state may not alter that choice. If Vermont wishes to confer a cause of action against municipalities that is more generous to plaintiffs than § 1983, it is free to do so, but it may not tinker with the boundaries of the cause of action created by federal statute. As the claim at issue on this appeal arises under § 1983, the district court correctly held that the Town could not, consistent with *Monell,* be held liable under § 1983 . . . . Accordingly, the claim against the Town was properly dismissed.

*Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) (citations omitted).

available under federal law." *Medrano v. City of Los Angeles*, 973 F.2d 1499, 1505 (9th Cir. 1992). As explained by the Ninth Circuit, "Congress did not intend to impose vicarious liability on municipalities under section 1983 and that, although states are free to impose vicarious liability, section 1983 cannot be used as the means to impose such liability." *Id.* (citing *Moor,* 411 U.S. at 710).

Accordingly, vicarious liability under Cal. Gov't Code § 815.2 is not a cognizable claim and the claim is therefore DISMISSED. Because this claim "could not possibly be cured by allegation of other facts," leave to amend is denied. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**B.      Claims Against Individual Defendants**

Next, Defendants argue that Plaintiff's supervisory liability claim against Defendants Roberts, Hatfield, and Garcia is untimely, and that relation back, the "Discovery Rule," and "Emergency Rule 9," are unavailable to save Plaintiff's claim. The Court considers each argument in turn.

**1.      Statute of Limitations[4]**

**a.      Relation Back**

Defendants contend that supervisory liability is barred by the statute of limitations ("SOL"). Because § 1983 does not provide a SOL, "federal courts borrow the forum state's limitations period for personal injury torts." *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). "California has a two-year statute of limitations for personal injury actions." *Klein v. City of Beverly Hills*, 865 F.3d 1276, 1278 (9th Cir. 2017) (citing Cal. Code Civ. P. § 335.1). Under federal law, the claim accrues from the date on which the SOL begins to run, or "when the plaintiff knows or has reason to know of the injury which is the basis of the action," *Lukovsky*, 535 F.3d at 1048 (quoting *Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 926

---

[4] Defendants also argue for dismissal of the supervisory claims against Defendants Roberts, Hatfield, and Garcia because they are entitled to qualified immunity. The Court need not address this argument because Plaintiff's supervisory claims are not timely.

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

United States District Court
Northern District of California

1    (9th Cir. 2004)), and "not when the plaintiff suspects the legal wrong," *id.* at 1049.

2           Plaintiff alleges multiple instances of constitutional violations on various dates: January 9,

3    10; February 1, 20, and 27; and March 20, 2019.  FAC ¶¶ 62–63, 65, 68, 70.  Taking the most

4    recent of these dates, the final date for Plaintiff to file her claims against Defendants was Mach 20,

5    2021.  *See Bird v. Dep't of Human Servs.*, 935 F.3d 738, 746 (9th Cir. 2019).  Plaintiff initiated the

6    instant action on January 6, 2021, but Defendants Roberts, Hatfield, and Garcia were named for

7    the first time in the FAC filed on October 6, 2022.  *See* FAC.

8           Defendants argue that Plaintiffs' individual claims against Roberts, Hatfield, and Garcia

9    are barred by the 2-year SOL because they were not named until October 6, 2022—approximately

10   a year and seven months after the SOL deadline.  Mot. at 14.  Plaintiff contends that Roberts,

11   Hatfield, and Garcia were identified as "Does" in the original complaint, which was filed within

12   the 2-year SOL period.[5]  The parties dispute whether the Doe amendment was permitted under the

13   "relation back" doctrine.

14          Because the limitations period derives from state law, Federal Rule of Civil Procedure

15   15(c)(1) mandates that the court consider both federal and state law "and employ whichever

16   affords the 'more permissive' relation back standard."  *Butler v. Nat'l Cmty. Renaissance of*

17   *California*, 766 F.3d 1191, 1201 (9th Cir. 2014).  Pursuant to Rule 15(c)(1), the amended

18   complaint will relate back to the date the original complaint was filed if the newly named

19   defendant "(i) received such notice of the action that it will not be prejudiced in defending on the

20   merits; and (ii) knew or should have known that the action would have been brought against it, but

21   for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  In addition,

22   Rule 4(m) mandates that a defendant is served within 90 days after the original complaint is filed,

23   and Roberts, Hatfield, and Garcia were not served until more than a year after the initial complaint

24   was filed.  Fed. R. Civ. P. 4(m); *see O'Neal v. Johnson*, No. 2:14-CV-2374-KJN-PST-EMP, 2016

25   WL 776924, at *3 (E.D. Cal. Feb. 29, 2016).  Accordingly, the FAC does not relate back to the

26   _____

27   [5] Plaintiff's original complaint listed "DOES 1-100" as defendants "legally responsible in some
     manner for the events and happenings" alleged.  Compl. ¶¶ 14–16.

28   Case No.: 5:21-cv-00092-EJD
     ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

United States District Court
Northern District of California

1   original complaint under federal law.

2   Under California law, an amended complaint that adds new defendants does not relate back

3   to the date of original filing.  *Woo v. Superior Ct.*, 75 Cal. App. 4th 169, 176 (Cal. Ct. App. 1999).

4   However, "where an amendment does not add a 'new' defendant, but simply corrects a misnomer

5   by which an 'old' defendant was sued, case law recognizes an exception to the general rule of no

6   relation back."[6]  *Hawkins v. Pac. Coast Bldg. Prods., Inc.*, 124 Cal. App. 4th 1497, 1503 (Cal. Ct.

7   App. 2004) (citations omitted) (collecting cases).  California Code of Civil Procedure Section 474

8   provides an exception, permitting relation back where the original complaint is stated against a

9   Doe defendant, and where plaintiff was "actually ignorant" of the true name of the doe defendant

10  at the time of filing.  *Barrows v. Am. Motors Corp.*, 144 Cal. App. 3d 1, 7 (Cal. Ct. App. 1983);

11  *see Woo*, 75 Cal. App. 4th at 177 (describing the standard as "genuine ignorance").  "So long as

12  the amended pleading relates to the same general set of facts as the original complaint, a defendant

13  sued by fictitious name and later brought in by amendment substituting his true name is

14  considered a party to the action from its commencement for purposes of the statute of limitations."

15  *Barrows*, 144 Cal. App. 3d at 7.

16  Defendants contend that this exception is not applicable here because Plaintiff knew about

17  Roberts, Hatfield, and Garcia at the time of initiating this action since she specifically identified

18  them in the original complaint and, therefore, she was not "actually ignorant" of their identities.

19  *See* Compl., ECF No. 1 ¶¶ 22–23, 100–03.  According to Plaintiff, while she was aware of

20  Defendants' names, she was not aware of the facts giving rise to these individuals' liability.

21  Opp'n at 14.  For the reasons explained below, the Court is not persuaded by Plaintiff's argument.

---

[6] *Hawkins* provides additional clarity on this point:

> Whether a plaintiff may amend the complaint to change a party's description or characterization after the statute of limitations has run depends on whether the misdescription or mischaracterization is merely a misnomer or defect in the description or characterization, or whether it is a substitution or entire change of parties.  In the former case an amendment will be allowed; in the latter, it will not be allowed.

*Hawkins*, 124 Cal. App. 4th at 1504 (quotations and citations omitted).

United States District Court
Northern District of California

Plaintiff's original complaint describes the Does as "unidentified officers, agents, representatives, or employees of the City who either (a) had final policy-making authority regarding . . . the hiring, training, and discipline of Code Enforcement Inspectors for the City, the investigation of City employee misconduct and complaints regarding City employees, Compl. ¶ 14, and whose "true names, capacities or involvement of the Defendants named herein as DOES 1 through 100, are unknown to Plaintiff," *id.* ¶ 15.  However, based on the allegations in the original complaint, Plaintiff knew of Defendants' names and their supervisory roles within the Code Enforcement Division at the time of initiating the action.

The original complaint identifies Roberts, Hatfield, and Garcia as Gerry's supervisors.  It specifically alleged that:

> At all times relevant, Hatfield and Roberts had supervisorial authority and responsibility over Gerry, were actually aware of and/or deliberately indifferent to Gerry's pattern, custom, practice, and policy of depriving civil rights afforded by the U.S. and California Constitutions, and had the authority to discipline and terminate Gerry, and to otherwise prevent Gerry from committing constitutional violations against Plaintiff while acting under color of law.

Compl. ¶ 23.  Plaintiff complains of: the lack of "supervisorial quality control of Gerry's outreach visits," noting that "Gerry's unit supervisor, Joseph Hatfield, attended two of Gerry's enforcement actions;" "Supervisor Hatfield did not conduct a single follow-up outreach visit to a spa formerly visited by Gerry to check on his employee's conduct and professionalism in dealing with the public;" and "Code Enforcement Division records show that Rachel Roberts, Gerry's other immediate supervisor, never visited a massage parlor in which Gerry conducted enforcement operations during the same nine-year span to check on Gerry's work."  Compl. ¶ 97.  Based on these allegations the Court cannot conclude that Plaintiff was "genuinely ignorant" of the facts giving rise to the supervisory liability claims.  *See, e.g.*, *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 935 F. Supp. 2d 968, 977, 981 (E.D. Cal. 2013) (declining to find relation back where the allegations in the newly amended complaint show that plaintiffs were aware of defendants and the inspection report that identified the alleged violations); *Ben-Dov v. Sragow*, No. 17-CV-00122-DFM, 2017 WL 6883917, at *2 (C.D. Cal. Nov. 3, 2017) (finding that

"Plaintiff's own allegations in her original complaint demonstrate that she was not 'genuinely ignorant' of the identity of Defendants"), *aff'd*, 735 F. App'x 455 (9th Cir. 2018).

Kearney's declaration filed in support of Plaintiff's opposition admits that the original complaint included information about Defendants' supervision, the anonymous letter, and the whistleblower complaint, but Kearney explains that counsel was "unaware of the extent" of Defendants' supervisory powers and investigatory failings with respect to Gerry. ECF No. 78, Ex. 1 ("Kearney Decl.") ¶¶ 14–15. Based on Plaintiff's knowledge of Defendants' identities and the allegations of their supervisory role contained in the original complaint, the Court is not convinced of Plaintiff's ignorance. Rather, Plaintiff asserted the supervisory liability claims only after the Court brought it to Plaintiff's attention. First Order at 17 (noting that Plaintiff "has not asserted a claim against Roberts, Hatfield, or any other supervisor in their individual capacity for supervisory liability."). Many federal courts have recognized that "plaintiff's deliberate choice not to sue a party involved in the events at issue in the complaint is not a mistake." *Hardesty*, 935 F. Supp. 2d at 981 (collecting cases).

### b. "Discovery Rule" and "Emergency Rule 9"

Plaintiff also argues that the "Discovery Rule" and "Emergency Rule 9" toll her claims against the individual Defendants. First, the Discovery rule does not save Plaintiff's claims. "The discovery rule requires the plaintiff to be diligent in discovering the critical facts of the case." *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999). For the reasons already explained, Plaintiff had sufficient information to assert the supervisory liability claims at the time of filing the original complaint. Second, "Emergency Rule 9 does not extend the statute of limitations on federal claims." *Lansdown v. Bayview Loan Servicing, LLC*, No. 22-CV-00763-TSH, 2022 WL 4227245, at *5 (N.D. Cal. Sept. 13, 2022) (collecting cases).

### c. Equitable Tolling Doctrine

Finally, Plaintiff asks the Court to equitably toll her claims. Along with the SOL period, a district court may borrow the state's equitable tolling rules. *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (en banc). Equitable tolling under California law essentially

1   "suspend[s] or extend[s] a statute of limitations as necessary to ensure fundamental practicality

2   and fairness." *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004) (quotation and citation omitted).

3   The "three core elements" that must be shown to equitably toll a claim under California law are:

4   "(1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to defendant in

5   gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct

6   by the plaintiff in filing the second claim." *Collier v. City of Pasadena*, 142 Cal.App.3d 917, 924

7   (1983).

8           The first prong of the test is satisfied.  Timely notice "means that the first claim must have

9   been filed within the statutory period . . . . [and] the filing of the first claim must alert the

10   defendant in the second claim of the need to begin investigating the facts which form the basis for

11   the second claim." *Collier*, 142 Cal. App. 3d at 924.  Plaintiff's originally filed claim for *Monell*

12   municipal liability was timely, and it is similarly predicated on a failure to supervise theory with

13   respect to Roberts, Hatfield, and Garcia's inaction resulting in Plaintiff's constitutional injury.

14   Because the theory underlying the *Monell* liability claim is "based on essentially the same set of

15   facts" as Plaintiff's untimely supervisory liability claim, the Court agrees that the *Monell* liability

16   claim was sufficient to alert Roberts, Hatfield, and Garcia of potential liability under supervisory

17   liability.  *Collier*, 142 Cal. App. 3d at 925; *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d

18   1131, 1141 (9th Cir. 2001) ("[O]nce defendant is aware of the wrong, the purpose of the statute of

19   limitations has been served.").

20           The second prong—prejudice—follows from the notice requirement and asks "whether

21   notice of the first claim affords the defendant an opportunity to identify the sources of evidence

22   which might be needed to defend against the second claim." *Collier*, 142 Cal. App. 3d at 925.

23   Here, Defendants had sufficient notice and time to gather evidence in their defense.  There is

24   substantial overlap between the evidence needed to defend the *Monell* liability theory for failure to

25   supervise and/or a practice of unsupervised solo code enforcement and the untimely supervisory

26   claim against Roberts, Hatfield, and Garcia for failure to supervise.

27           Third, Plaintiff exercised "good faith and reasonable conduct" in filing the second claim.

28   Case No.: 5:21-cv-00092-EJD
    ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

United States District Court
Northern District of California

*Collier*, 142 Cal. App. 3d at 924.   While "[t]he third prerequisite of good faith and reasonable conduct on the part of the plaintiff is less clearly defined in the cases," there is nothing in the record to indicate that Plaintiff's conduct was unreasonable or "deliberately misled" Defendants. *Id.* at 926.  Plaintiff notes that this case was stayed seven months after it was initiated while Gerry's criminal action was pending, which impacted Plaintiff's ability to investigate the claims, and Plaintiff filed the FAC the same day that the Court lifted the stay.  Opp'n at 11; *see* ECF Nos. 45, 60, 61.  The Court is also guided by the policies and the purpose underlining the doctrine which is to prevent "the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court."  *Daviton*, 241 F.3d at 1137.

Accordingly, Plaintiff's supervisory liability claims against Defendants Roberts, Hatfield, and Garcia are equitably tolled.

### 1.    Supervisory Liability

Plaintiff's first cause of action asserts that individual Defendants Roberts, Hatfield, and Garcia are liable to Plaintiff for her injuries based on a theory of supervisory liability.  FAC ¶ 90. Defendants move to dismiss the supervisory claim against the individual Defendants as insufficient to state a claim against them and raise the defense of qualified immunity.

Although a supervisor may not be held liable on a theory of respondeat superior under § 1983, a supervisor may be held individually liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional deprivation."[7]  *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (internal quotations and citation omitted).  "The requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury."  *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) (quotations and citations omitted) (cleaned up).

---

[7] Plaintiff does not allege that Hatfield, Roberts, or Garcia "participated in or directed the violations."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

United States District Court
Northern District of California

United States District Court
Northern District of California

1    A supervisor need not be physically present when the constitutional violation occurs.

2  *Starr*, 652 F.3d at 1205.  "Rather, the supervisor's participation could include his 'own culpable

3  action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in

4  the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless

5  or callous indifference to the rights of others.'"  *Id.* at 1205–06 (quoting *Larez v. City of Los*

6  *Angeles,* 946 F.2d 630 (9th Cir. 1991).  After *Iqbal*, liability premised on supervisors' "mere

7  knowledge and acquiescence" in a subordinates' misconduct is not enough.  *Ashcroft v. Iqbal*, 556

8  U.S. 662, 677 (2009).  A plaintiff may state a claim against a supervisor based upon a supervisor's

9  "acquiescence or culpable indifference" only where deliberate indifference is shown.  *Starr*, 652

10 F.3d at 1207.

11   The FAC sufficiently alleges that Defendants Hatfield, Roberts, and Garcia exercised

12 supervisory authority over Gerry.  For example, Hatfield and Roberts supervisorial responsibilities

13 included:

> [T]he power to assign him to a specific team or task, define his job responsibilities, establish his workplace standards and rules of conduct, supervise his field work, review and verify his work, audit his performance, investigate any concerns or complaints about him, assign him to desk duty, discipline him, suspend him and terminate him for cause.

17 *Id.* ¶ 28.  Garcia, who was the Chief of the SJPD during the time that Gerry assisted with the SJPD

18 Vice Unit's enforcement of the Massage Ordinance, "ensur[ed] proper training, supervision,

19 auditing, investigation, and discipline of Gerry when he was supporting and partnering with the

20 SJPD's Vice Unit."  *Id.* ¶ 22.

21   Plaintiff's theory of liability is that Hatfield, Roberts, and Garcia acted with "deliberate

22 indifference based upon . . . [their] knowledge of and acquiescence in unconstitutional conduct by

23 his or her subordinates" by failing to act, *i.e.*, failing to supervise or investigate.[8]  *Starr*, 652 F.3d

24 at 1207.  The FAC alleges that Defendants had received credible complaints that Gerry was

---

[8] To the extent that Plaintiff asserts that Defendants failed to investigate by not conducting a background check on Gerry, Plaintiff's allegations are substantially the same as those addressed in the First Order and therefore fail for the same reasons.  *See* First Order at 14–15.

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND
24

engaging in sexual misconduct during his enforcement visits but failed to properly investigate or act on this information by removing Gerry from the field and assigning him to "desk duty" until investigations were complete.  Opp'n at 15; FAC ¶¶ 44–48.  For example, Plaintiff alleges that Roberts received the anonymous email which contained a photo of Gerry in an intimate embrace with an Asian woman who was letter identified as an employee of a massage business that Gerry had visited for code enforcement.  FAC ¶¶ 43, 44.  The letter accused Gerry of having a sexual relationship with the woman pictured.  *Id.* ¶ 43.  Plaintiff also alleges that based on "information and belief" Roberts, Hatfield, and Garcia were aware of the whistleblower email received by the Code Enforcement Division accusing Gerry bribing and sexually harassing and/or assaulting massage business owners—and specifically "people in the Asian community."  *Id.* ¶ 47–48.  This complaint was allegedly not investigated.  *Id.* ¶ 48.

Defendant challenges whether the anonymous letter would have informed Roberts that Gerry was violating Plaintiff's constitutional rights because the letter only alludes to an improper intimate relationship with a massage establishment owner.  Mot. at 23.  Whether the letter suggests that Gerry would sexually assault and bribe massage business owners or not—which the Court found that it does not in the previous Order—because Roberts gave the letter to the SJPD to conduct a criminal investigation,[9] FAC ¶ 46, the Court cannot say that Roberts's actions show "acquiescence or culpable indifference" to Plaintiff's constitutional rights.  *See* First Order at 19.  Plaintiff suggests that, after turning over the letter to the SJPD, Roberts failed to take immediate steps to ensure that Gerry was not abusing his authority, such as conducting an internal investigation, pulling Gerry from the field, accompanying Gerry on subsequent enforcement visits, or following up with massage establishments that Gerry had visited, despite Roberts's knowledge of the "nexus between human trafficking and the massage industry."  FAC ¶¶ 44–46.  FAC ¶¶ 45–

---

[9] Plaintiff alleges that Roberts turned over the letter to the SJPD for an investigation into the anonymous author, not Gerry, and that the SJPD "took no steps to investigate the allegations against Gerry."  FAC ¶ 46.  Roberts is not responsible for the subsequent actions of the SJPD, and it was reasonable for Roberts to believe that the police conducted a proper investigation into Gerry after she provided the letter.

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

United States District Court
Northern District of California

46.  Even if Roberts acted carelessly in allowing Gerry to continue code enforcement visits, "negligence does not suffice for due process liability."  *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012); *see Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("The Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.").

Plaintiff's allegations with respect to Hatfield, Roberts, and Garcia's knowledge of the whistleblower complaint and failure to act on it are also insufficiently pled.  Plaintiff alleges that "on information and belief" Roberts, Hatfield, and Garcia were aware of the whistleblower complaint and "took no steps to prevent Gerry from harming other women working in the massage industry" but Plaintiff does not provide a factual basis for this belief.  FAC ¶¶ 48, 53.  For example, the FAC alleges that the whistleblower complaint was submitted to the Office of Employee Relations, *id.* ¶ 48, but Plaintiff does not explain whether supervisors in the Code Enforcement Division received notice of the whistleblower complaint, or whether the SJPD was informed of the complaint such that Chief Garcia would be aware of the accusations against Gerry. As pled, Plaintiffs do not indicate why Roberts, Hatfield, and Garcia would have known about the whistleblower complaint and thus whether they acquiesced or acted with culpable indifference. *See Starr*, 652 F.3d at 1208.

Accordingly, Plaintiff has not sufficiently alleged supervisory liability against Defendants Hatfield, Roberts, and Garcia.[10]

### C.    Leave to Amend

Plaintiff requests leave to amend any pleading deficiencies.  "Requests for leave to amend should be granted with 'extreme liberality.'"  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020).  A court should not grant leave to amend if "it determines that the pleading could not possibly be cured by allegation of other facts."  *Cook, Perkiss and Liehe*, 911 F.2d at 247.  For the reasons already explained, the Court finds that amendment of the vicarious liability

---

[10] In light of this conclusion, the Court does not reach Defendants' qualified immunity argument.

Case No.: 5:21-cv-00092-EJD
ORDER GRANTING MOT. TO DISMISS W/ LEAVE TO AMEND

1  claim would be futile.  However, the Court cannot say that Plaintiff is unable to allege facts

2  establishing the existence of *Monell* or supervisory liability at this time, and therefore Plaintiff is

3  permitted leave to file a second amended complaint.

4  **IV.     CONCLUSION**

5       For the foregoing reasons, the Court GRANTS the motion to dismiss with limited leave to

6  amend as explained in this Order.  Should Plaintiffs choose to file an amended complaint, they

7  must do so by **December 21, 2023**. Plaintiffs may not add new claims or parties without leave of

8  the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

9       **IT IS SO ORDERED.**

10  Dated: November 30, 2023

12   

13  EDWARD J. DAVILA
   United States District Judge