UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAI TRANG THI NGUYEN,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants. | Case No.   5:21-cv-00092-EJD<br><br>**ORDER DENYING MOTIONS TO EXCLUDE EXPERT OPINIONS; GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 134, 137, 138 |

Plaintiff Dai Trang Thi Nguyen ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendant City of San Jose ("City") and individual Supervisor Defendants Joseph Hatfield ("Hatfield") and Rachel Roberts ("Roberts") (collectively, "Supervisor Defendants") (all together with the City, "Defendants"), alleging that a former City Code Inspector William Gerry ("Gerry") sexually assaulted and extorted Plaintiff during his code enforcement inspections of her massage business, and Defendants allowed Gerry's conduct to occur in deliberate indifference to her rights to due process and equal protection.  *See* Second Am. Compl. ("SAC"), ECF No. 93; Order Den. Third Mot. to Dismiss ("Third MTD Order"), ECF No. 103.[1]

Before the Court are three motions: (1) Defendants' motion to exclude expert testimony of Officer Anthony Flores ("Flores") and Leonard Powell ("Powell") pursuant to Federal Rule of Evidence 702; (2) Plaintiff's motion to exclude the expert testimony of Dr. John Greene ("Greene") under Federal Rule of Civil Procedure 26; and (3) Defendants' motion for summary

---

[1] Plaintiff has stipulated to the dismissal of individual Defendants William Gerry and Edgardo Garcia.  Opp'n to MSJ 1.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
1

judgment.  Pl.'s Mot. to Strike, ECF No. 134; Defs.' Mot. to Strike, ECF No. 137; Mot. for Summ. J. ("MSJ"), ECF No. 138.  All motions are fully briefed.  Opp'n to Defs.' Mot. to Strike, ECF No. 140; Reply ISO Defs.' Mot. to Strike, ECF No. 141; Opp'n to Pl.'s Mot. to Strike, ECF No. 135; Reply ISO Pl.'s Mot. to Strike, ECF No. 136; Opp'n to MSJ, ECF No. 139; Reply ISO MSJ, ECF No. 142.

The Court held a hearing on January 15, 2026, and heard oral arguments from both parties. ECF No. 144.  For the reasons stated below, the Court **DENIES** both motions to exclude expert testimony; **GRANTS** Defendants' motion for summary judgment as to Supervisor Defendants; and **DENIES** Defendants' motion for summary judgment as to the City.

## I.    BACKGROUND

It is undisputed that former City Code Inspector Gerry repeatedly raped and extorted Plaintiff while inspecting her massage business in 2019.[2]  The Court will discuss in turn facts relevant to Plaintiff's claims against the City and Supervisor Defendants.

### A.    The City

Plaintiff alleges the City acted with deliberate indifference to Plaintiff's rights to due process and equal protection by implementing a practice of sending male code inspectors into massage establishments alone and unsupervised, despite the obvious risk that such a practice is likely to lead to exploitation and injuries such as Plaintiff's, and despite the several prior complaints received specifically about Gerry's misconduct.  Plaintiff also alleges the City's fragmented reporting and supervision policy allowed Gerry's conduct to continue despite the several prior complaints.

#### 1.    Code Enforcement Practices and Industry Knowledge of Risks

The City has an undisputed practice of sending solo male code inspectors into massage businesses unsupervised.  To prove that this practice was adhered to with deliberate indifference to Plaintiff's rights, Plaintiff plans to introduce two industry experts, Powell and Flores.  Both

---

[2] Gerry is currently serving a thirty-four-year prison sentence for these and other crimes.

United States District Court
Northern District of California

experts have submitted reports and deposition testimony opining that the City's practice presented obvious risks of harm, and against this backdrop, Gerry especially should have been removed from the field following the complaints of serious misconduct. Powell Report, ECF No. 137-2; Flores Report, ECF No. 137-4. The Court will discuss these opinions in greater detail in its discussion of Defendants' motion to strike below.

Plaintiff also highlighted during oral arguments that Roberts and Hatfield agreed in their depositions that Gerry required a particularly high degree of supervision given his considerable authority as the only massage business code inspector in the City. *See* Hatfield Dep. 76:14–77:8, ECF No. 139-1; Roberts Dep. 52:5–15, ECF No. 139-1.

### 2.    Complaints

Considering this context, Plaintiff presents evidence of five complaints they argue should have made the risk of harm in the City's code enforcement practices even more obvious.

First, at some point in 2015 prior to his work in the Code Enforcement Office, a female City employee reported to the City that Gerry hugged her from behind, touched her breasts, put her in a headlock, and touched her knee. Additional Fact No. 14, ECF No. 142-2.[3] This complaint was never disclosed to Hatfield and Roberts when they became his supervisors two years later. *Id.* The City provides that the incident was investigated, and the City found no wrongdoing. *Id.*

Second, on September 18, 2018, the husband of a massage worker contacted the City to report Gerry's conduct toward his wife, Anh Moore. Additional Fact No. 15. The complaint was assigned to the Office of Employee Relations ("OER") and investigated by OER Senior Executive Analyst Cheryl Parkman. Additional Fact No. 16. Moore reported to Parkman that Gerry told her she was "his lady," touched her shoulder when she tried to walk away, pressured businesses not to hire her, and boasted that he has "lots of girlfriends" and that "people wanted to sleep with [him]." *Id.* She also reported other workers feared complaining about Gerry because of his status as a City

---

[3] The Court incorporates the parties' citations to the record in their Separate Statements.

employee. *Id.* Parkman discounted Moore's report for various reasons, including Moore having been previously cited for prostitution. Additional Fact No. 17. Parkman did not notify anyone in the Code Enforcement Office about the complaint. Additional Fact No. 19. Hatfield and Roberts learned of this report for the first time during their deposition and both expressed shock. *Id.* Roberts stated that she felt "gobsmacked" and testified that she would have expected to be informed of this complaint. *Id.*

Third, on September 27, 2018, the City received a report to the Code Enforcement Office that Gerry's City vehicle was parked outside a massage establishment for an extended period of time. Additional Fact No. 20. Roberts questioned Gerry and relied on his explanation that he was there on official business without further investigation. *Id.*

Fourth, in October and November 2018, the City received four handwritten letters accusing Gerry of misconduct. Additional Fact No. 21. The letters were routed to Roberts, Hatfield, and Parkman, as well as Lieutenant Paul Messier at the San Jose Police Department ("SJPD"). *Id.* The letters stated that Gerry was "having sex with a girl massage," that he "protect[ed]" illicit spas, and that Gerry showed favoritism to one spa that employed "underage girl" masseuses while providing illegal "extra" services. *Id.* Photos enclosed with the letters showed Gerry embracing a young Asian woman and another image of him with his face pressed to hers. *Id.* Roberts forwarded the letters to SJPD out of concern that Gerry was being blackmailed. Additional Fact No. 22. Messier testified the photographs were immediately concerning because they suggested an inappropriate relationship with a woman in a regulated establishment, but he had no authority over Gerry's supervision as a code inspector. *Id.*

Finally, on December 16, 2018, approximately three weeks before Gerry met with Plaintiff for the first time, the City received another complaint through the OER Whistleblower Hotline. Additional Fact No. 24. The anonymous caller informed the City that Gerry was "taking advantage of the Asian community," including by improperly touching Asian women working in massage parlors, "rubbing and squeezing" their shoulders and backs, and taking women into back rooms and insisting that they massage him. *Id.* The caller further reported that Gerry allowed

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
4

"bad kind of massage stores" to remain open, received "envelopes of money," and that photos and video documented his conduct. *Id.* Parkman was also assigned to investigate this complaint and referred it to the SJPD. Additional Fact No. 25. Parkman did not disclose the complaint to the Code Enforcement Office. *Id.* Messier received the complaint and was "very concerned," even "jumping out of [his] chair," because the whistleblower allegations were detailed and credible. Additional Fact No. 27. But Messier had no authority to restrict Gerry's duties. *Id.* Hatfield and Roberts learned of this complaint for the first time at their deposition as well and expressed similar shock. Additional Fact No. 26. Hatfield testified that he "wish[ed] [he] knew" of the complaint at the time, and he could have supervised Gerry differently or removed him from the field. *Id.*

### 3. The City's Reporting System

As referenced above, Plaintiff recently discovered that complaints about Gerry were handled either by the Code Enforcement Office, the OER, or the SJPD. The Code Enforcement Office had day-to-day supervisory authority over Gerry and could reassign him, require accompaniment, or limit access to massage businesses. Additional Fact No. 12. The OER had the authority to investigate misconduct, recommend duty restrictions, place employees on leave, or recommend discipline. *Id.* The SJPD had no supervisory authority over Gerry. Additional Fact No. 13.

Shortly after Gerry's arrest, then City Mayor Sam Licardo issued a public statement on the City's failed reporting systems. Additional Fact No. 28. The Mayor acknowledged that the City lacked defined procedures for ensuring that complaints were routed to the appropriate supervisory officials and indicated that the City would implement new protocols to ensure similar allegations were handled properly in the future. *Id.*

### B. Supervisor Defendants

Roberts and Hatfield were Gerry's supervisors in the Code Enforcement Office during this time. Plaintiff originally alleged that they were aware of all complaints lodged against Gerry, but as discussed above, Plaintiff now knows this was not the case—it is undisputed that Supervisor

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
5

Defendants discovered the Moore report and the OER Whistleblower Hotline complaint for the first time during their depositions. Instead, the Code Enforcement Office received only two complaints: (1) the September 2018 suspicious vehicle report; and (2) the October and November 2018 handwritten letters. Fact Nos. 30, 35. Roberts knew of both, but Hatfield was never made aware of the vehicle report. Fact No. 37. Roberts discussed the vehicle report with Gerry and was satisfied by his explanation that he was present at that facility on official business. Fact No. 36. Roberts also questioned Gerry about the handwritten letters, instructed him to not to return to the businesses implicated in the letters, informed Hatfield of the issue, and sent the letters to the SJPD to investigate, believing they were evidence that Gerry was being extorted. Fact Nos. 31, 32, 33, 34.

## II.    LEGAL STANDARD

### A.    Motion to Strike Expert Testimony

Courts act as the gatekeeper of expert testimony to ensure that such testimony is reliable and relevant under Federal Rule of Evidence 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of expert testimony has the burden of proving admissibility. *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted). Before an expert can offer her opinions, she must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.* This multifactor inquiry is flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted). But "there is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
6

United States District Court
Northern District of California

The district court enjoys "broad latitude" with regard to how to determine reliability. *Kumho Tire Co.*, 526 U.S. at 142. A district court must distinguish an expert's qualifications from the reliability of the expert's principles and methods. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315–16 (9th Cir. 1995). What courts assess "is not the correctness of the expert's conclusions but the soundness of his methodology." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.    Motion for Summary Judgment

Courts may grant summary judgment on a claim or defense only if the moving party shows "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute when enough evidence exists in the record for a reasonable fact finder to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material when it might affect the outcome of the case. *Id.* When evaluating whether a moving party has satisfied this standard, courts view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). This moving party bears the initial burden of showing that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, the opposing party must produce affirmative evidence "from which a jury could find in [its] favor" in order to defeat summary judgment. *F. T. C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

## III.    DISCUSSION

The Court will begin with the parties' motions to strike expert testimony before moving to Defendants' motion for summary judgment.

### A.    Motions to Strike

The Court finds Powell and Flores meet Federal Rule of Evidence 702's criteria to testify

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ

7

as expert witnesses, and Greene may be introduced as a rebuttal expert under Federal Rule of Civil Procedure 26. The parties may still raise objections regarding the admissibility of specific opinions in motions in limine or during trial.

### 1.    Powell

Powell served as the Code Enforcement Manager, Zoning Administrator, and Deputy Building Official for Dangerous Building Enforcement for the City of Fremont from 2001 to 2020, where he supervised officers enforcing zoning, housing, sanitation, and building codes. Powell Report 2. As part of this role, he developed processes and managed investigations in massage business regulation and enforcement, trained and supervised officers, and implemented ethics and accountability systems. *Id.* Prior to this role, Powell worked as Senior Code Enforcement Officer, Transit Manager, and Airport Manager with the City of Tracy from 2000–2001. *Id.* He has also served multiple terms as Director of the California Association of Code Enforcement Officers ("CACEO"), where he authored the California Code Enforcement Officer Standards Act, authored CACEO Administrative Regulations, published educational articles, and trained officers and supervisors on code enforcement practices throughout the state. *Id.* at 3. The California Code Enforcement Officer Standards Act and its regulations created recognition for code enforcement as a public safety profession, established statewide training and ethical standards, and created a certification program. *Id.* As a CACEO instructor, Powell taught at academies, conferences, and trainings across California on topics including ethics and supervisory responsibility in high-risk enforcement environments such as massage establishments. *Id.* In recognition of this work and more, Powell received a Presidential Award of Achievement and Lifetime Achievement awards from CACEO. *Id.* at 3–4.

Powell bases his opinions here on this experience, as well as several supplemental sources including: the CACEO regulations; the Code Enforcement Officer Certification training specifications; two Polaris articles regarding human trafficking in illicit massage businesses; and the City's municipal code. *Id.* at 6.

In considering all of the above, Powell formed seven overarching opinions in this case:

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
8

1.    "Municipal code enforcement inspectors have unique authority over the subjects of their enforcement activities that requires proper oversight."

2.    "The city of San José massively understaffed its code enforcement division tasked with investigating the massage industry."

3.    "It is well-known in the code enforcement community that massage businesses are majority owned and operated by immigrant women who are particularly vulnerable to abuse."

4.    "Solo male code inspections of massage businesses are improper."

5.    "Despite the well-known and foreseeable risks, it was San Jose's policy to give Gerry an unreasonably immense amount of power over massage businesses as its solo male code inspector."

6.    "Because the city's policy of solo male code enforcement gave so much power to Gerry, it was essential to have systems in place to detect and prevent him from abusing his power."

7.    "The supervision policies of San José were not adequate to prevent violations of law by Gerry."

*Id.* at 7–22.

Plaintiff plans to use Powell's testimony in part to prove deliberate indifference—i.e., that the City was on constructive notice that its failure to adhere to certain best practices, including using a partner system for inspections, would likely result in a constitutional violation.

Defendants argue Powell's testimony should be excluded because: (1) his opinions do not help the jury decide the case; (2) his opinions are unreliable; and (3) he bases his opinions on "common sense." The Court will address each argument in turn.

### a.    Helping the Jury Decide the Case

Rule 702 requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Defendants argue Powell's testimony will not help the jury decide whether the City was deliberately indifferent. Powell's report identified several "best practices" in the code enforcement industry that San Jose was not implementing at the time of Plaintiff's injury,

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
9

including: using partner systems for inspections; random supervisory audits; rotation of inspectors across industries; direct supervisory contact with regulated businesses; and formal post-action debriefs. Powell Report 18. However, during his deposition, Powell testified that he does not believe code inspectors are "likely" to extort or sexually assault people absent those "best practices." Powell Dep. 40:1–10, ECF No. 137-3. Defendants argue this renders his testimony irrelevant to the ultimate question—whether the city was on constructive notice that its policy of solo male code enforcement would likely result in a constitutional violation.

The Court finds this does not disqualify Powell from testifying as an expert in this case. Although Powell declined to use the word "likely" in his deposition, he also testified there is "a high probability" that lone male enforcement officers would commit sexual assault and corruption, and that lone code enforcement officers going into massage businesses is an outdated practice because "there is a high probability" that something may go wrong. *Id.* at 53:18–20, 76:22–24. While Defendants' argument may present a question of witness credibility for the jury to weigh, it does not render Powell's opinion on this matter unhelpful to the jury. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

### b.    Reliability

Rule 702 also requires that an expert's testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Expert testimony is generally deemed sufficiently reliable if the expert has "good grounds" for the testimony—i.e., if the expert's conclusions are based on the knowledge and experience of the expert's discipline rather than on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

Defendants argue that Powell's opinions are narrowly based on his experience in the City of Fremont and the City of San Rafael, which is insufficient to opine on industry-wide practices.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
10

To illustrate this point, Defendants point to Powell's opinion that best practices for inspection of massage businesses include "multi-inspector teams, strong female representation, and supervisory presence," Powell Report 12; yet during his deposition, he testified that the only jurisdiction other than Fremont that implemented these practices was San Rafael. Powell Dep. 18:13–25. Defendants also argue Powell's opinions are unreliable because he could not identify any written standard, guideline, or other documentation that addresses interactions between code enforcement inspectors and women in the massage industry.

The Court finds Defendants' arguments unpersuasive. Defendants' assertion that Powell's experience is limited only to Fremont and San Rafael is taken out of context and contradicted by his documented experience. As author of the California Code Enforcement Officer Standards Act and CACEO guidelines, Powell drafted California legislation and regulations that established statewide training and ethical standards for code enforcement officers, and he implemented these standards in Fremont. When asked about which other jurisdictions have implemented these standards, he listed San Rafael as one of the "other Bay Area cities" with similar practices. Though he could not recount the other jurisdictions during his deposition, he maintained his belief that other cities beyond San Rafael implemented these practices as well. Powell Dep. 18:13–25. This presents an issue of fact for the jury; it does not reflect a failure to base his opinions on the knowledge and experience of his discipline.

As for his reliance on external written documents, this is not necessary for Rule 702 purposes. So long as the witness "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," than the witness may rely "solely or primarily on experience." Fed. R. Evid. 702, advisory committee notes to 2000 amendments (citing *Daubert*, 43 F.3d at 1319). Powell does so here. As detailed above, Powell has served as a code inspector supervisor for nearly two decades and authored the California legislation and regulation that established statewide training

and ethical standards.[4]  In his report and his deposition, he has sufficiently explained how this experience formed his opinions on best practices in this industry, and he relies on that experience to opine on the facts of this case.  Therefore, Defendants' arguments regarding the lack of written documents go to weight rather than admissibility.  *See Engilis*, 151 F.4th at 1049 ("[C]hallenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion."); *see also Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022) ("The judge is 'a gatekeeper, not a fact finder,' and the 'gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.'").[5]

### c.    Common Sense

Finally, Defendants argue that Powell's opinions on code inspector supervision amount only to "common sense," not the opinion of an expert.  For example, Defendants contend that Powell "pointed to a 'common sense supervisory assessment'" as support for the opinion that Roberts and Hatfield should have been made aware of all complaints about Gerry.  Def.'s Mot. to Strike 8 (quoting Powell Dep. 109:14–16).  Defendants also highlight Powell's testimony that his re-assignment protocols are not specific to code enforcement, but rather, are "kind of everywhere in life such as a consumer transaction. If one person has a conflict with somebody else in a commercial setting, the general approach is, 'Can I talk to somebody else?'"  *Id.* at 8–9 (quoting Powell Dep. 71:11–21).

But, as Plaintiff highlights, Defendants' excerpts of Powell's deposition are taken out of context.  For example, the phrase "common sense supervisory assessment" was counsel's, not

---

[4] Though Defendants correctly highlight that the Code Enforcement Officer Standards Act itself doesn't promulgate any inspection standards, the Act designates the California Association of Code Enforcement Officers as the body to promulgate standards and certify examinees under such standards.  Powell Dep. 9:20–10:19.  Powell served multiple terms as Director of CACEO, where he wrote the CACEO Administrative Regulations he discusses in his deposition.

[5] The Court also notes that Powell's expertise differs significantly from the medical and scientific experts in the cases Defendants reference.  *See, e.g., Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782–83 (3d Cir. 1996) (treating physician testimony admissible because diagnosis based on lab results, the patient's symptoms, and his experience).

Powell's:

> A. So my opinion is that it didn't include -- well, it was inadequate that it didn't include notifying the department supervisors initially, and it was silent prior to July 8, 2021, on how to treat the incidents of a crime.
> Q. Okay. Anything else?
> A. Yeah. My concern is that based on the way the document is written, it was inadequate in that it did not trigger the code enforcement supervisors to be notified of the complaints automatically or initially, or even be consulted or form a team. And the result was as was stated in Hatfield's testimony or deposition that, "Had I known about certain complaints, I would have acted on them." I think this policy would default it to create that result. And that's -- that's my comment.
> Q. Okay. Is there any industry standard or CACEO policy that you're aware of that would inform that assessment on your part?
> A. Not specifically. I think it's good supervisory practice that if an employee is committed or committing a crime against a person that the agency do all that they can to protect everybody involved immediately and take swift action and not allow employees to say, "Well" -- and create the opportunity for employees -- the supervisor to say, "Well, I wasn't notified. I couldn't do anything," or to sit parked in a -- in the office of an employee relations department who may not -- may not see that report for some days.
> Furthermore, I think the policy should have a timeline on how many dates it can sit before the notifications are made to those who can take immediate intervention, such as the code enforcement supervisor.
> **Q: And that's sort of your common sense supervisory assessment?**
> A. Yes."

Powell Dep. 108:6–109:16 (emphasis added). And before discussing his general observations of re-assignments in commercial settings, Powell testified that his knowledge of re-assignment practices for code enforcement inspectors was based on his experience in the code enforcement field. The entire query reads as follows:

> Q. Okay. In section 7.8. it's your opinion that – and take your time to review it, but that Gerry wasn't re-assigned and that best practice dictates that he should have been. Is that right?
> A. I'm reading it. Yes. My opinion is what's stated in the first sentence, remove them from the assignment pending investigation.
> Q. Okay. And it's also your opinion that that's a best practice?
> A. Yes.
> **Q. Where is that identified as a best practice other than in your report?**
> **A. I don't know. I learned it through practice from city manager on down.**
> Q. At the City of Fremont?
> A. Yes.
> Q. Anywhere else?
> A. Well, kind of everywhere in life such as a consumer transaction. If one person has a conflict with somebody else in a commercial setting,

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
13

> the general approach is, "Can I talk to somebody else?" So substituting somebody to remove an immediate conflict is an efficient use of resources, and that carries over into code enforcement where removing the code inspector from a case where there seems to be a dispute, or an allegation, is the easiest way to park it and the most efficient way to carry on with business while preserving safety and integrity.
> **Q. Anything else specific to the code enforcement environment?**
> **A. Yes. It's my entire experience has been that code enforcement officers tend to take that personally and say, "No, I don't want to be removed," so a supervisor needs to have thick enough skin to be able to explain and articulate why it's in everybody's best interest on a temporary removal and assignment. And it should go further that than. There should be regular rotation anyway so that one does not decide on its own regulated community.**

Powell Dep. 70:25–72:14 (emphasis added).

Upon reviewing the whole record, the Court finds Powell sufficiently uses his expertise in the code enforcement industry, rather than common sense available to any lay person, to provide his opinions.

Accordingly, the Court finds that Powell is qualified as an expert by his knowledge, skill, experience, training, and education in the code enforcement industry. Plaintiff has also sufficiently demonstrated it is more likely than not that Powell's expertise will help the jury understand the evidence and determine the issue of deliberate indifference; that his testimony is based on sufficient knowledge of the industry; that his testimony is the product of reliable principles; and that his opinion reflects a reliable application of these principles to the facts of this case.

The Court therefore **DENIES** Defendants' motion to exclude Powell's expert testimony.

### 2. Flores

Flores has been a police officer with the San Francisco Police Department ("SFPD") since 1982. Flores Report 1. He is currently acting Lieutenant in charge of the human trafficking unit. *Id.* During his career, Flores has conducted and supervised "several hundred" massage business inspections, often as many as fifty to sixty per year. *Id.* at 2. He describes these inspections as always consisting of multiple people, including sworn police officers and, on occasion, non-sworn enforcement personnel from other agencies such as the Department of Public Health. *Id.* During

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
14

his work in the SFPD Vice Unit, Flores worked extensively with municipal code inspectors as well. *Id.* at 6. Flores also regularly teaches other law enforcement professionals how to conduct investigations involving vulnerable community members, including massage workers, and he is an instructor at the SFPD academy, where he teaches courses on Human Trafficking, Vice Crimes, Domestic Violence, and Principled Policing. *Id.* at 2.

Flores bases his opinions here on this experience, as well as several supplemental sources including: a United Nations article on human trafficking; an article regarding sexual violence perpetrated by police; two Polaris articles regarding human trafficking in illicit massage businesses; an article on law enforcement sexual misconduct prevention and accountability; and the City's municipal code. *Id.* at 4–9.

In considering all of the above, Flores formed seven overarching opinions in this case:

> 1.    "Allowing lone men (whether sworn or unsworn) to conduct enforcement activities in massage parlors is an archaic and outdated concept that is virtually unheard of in the twenty-first century. The norm is to send multiple inspectors at a time into an establishment-preferably including female inspectors-to reduce the risk of sexual harassment or assault."
>
> 2.    "These precautions are necessary because there is a patently obvious risk of sexual assault associated with sending men into a space known to be staffed by indigent, immigrant women, who have limited educational opportunities, speak little to no English, and in some cases have been human trafficked."
>
> 3.    "Based on my knowledge of the industry, it is impossible that those with supervisory authority over Mr. Gerry were unaware of this obvious consequence of lone male enforcement. That is doubly true once allegations of misconduct-complete with photographs-were made public."
>
> 4.    "The thought that after credible complaints were received, the City of San Jose and Gerry's Supervisors did not take affirmative steps to immediately protect the public is outrageous."
>
> 5.    "Supervisors and investigators that I teach throughout the State are well aware that municipal employees with enforcement power over massage workers would be prone to violate their constitutional rights-or at a minimum be put in compromising positions-without strict supervision and accountability."
>
> 6.    "Massage businesses are particularly susceptible to corruption as a consequence of the vulnerable immigrant women who run them,

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
15

United States District Court
Northern District of California

therefore particularly strict supervision is required of enforcement officers."

7. "The City's failure to properly supervise William Gerry endangered the public and led to the extortion and/or sexual assault or harassment of multiple women, including Dai Nguyen."

*Id.*

Defendants argue Flores's testimony should be excluded because: (1) he lacks the expertise to provide opinions on code enforcement; (2) his opinions are unreliable; and (3) he bases his opinions on "common sense."  The Court will address each argument in turn.

### a.       Expertise

Defendants first argue that Flores lacks the code enforcement expertise necessary to offer opinions about the industry because he is a police officer, not a code enforcement inspector. Defendants also contend that the articles he references are specific to police conduct; he testified that he has never taught non-sworn personnel like code inspectors; and he testified that he has never received instruction on supervision of code inspectors in massage businesses.

The Court finds that, despite his role as a police officer, Flores possesses the expertise required under Rule 702 to testify on code enforcement practices in massage businesses.  Though Flores has never been a code inspector, Flores has worked extensively with code enforcement inspectors in his "several hundred" massage business inspections.  Flores also testified that he has seen code inspectors operate with enforcement powers akin to those of police officers, particularly in the eyes of certain vulnerable communities including illicit massage business employees, such that the distinction between police officer and code enforcement investigator may be immaterial in this context.  Flores Dep. 88:14–90:20, ECF No. 137-5.  This experience is sufficient to opine on the City's policies regarding massage code enforcement of massage entities and to illustrate the intricacies of code enforcement police powers.  *See, e.g., Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269–1270 (9th Cir. 1994) (finding a longshoreman qualified to opine on unreasonably dangerous work environment).

The Court also observes that Defendants' references to Flores's testimony are, again here, taken out of context.  For example, Defendants represent that Flores has never taught non-sworn

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ

United States District Court
Northern District of California

personnel like code inspectors, but this statement was made in response to counsel's question of whether Flores has taught non-sworn personnel *outside* of San Francisco.  In the page prior to Defendants' citation, Flores testified that he has, indeed, taught non-sworn personnel like code inspectors:

> **Q. What about your classes on human trafficking investigations at massage parlors to nonsworn personnel? Have you taught that course?**
> **A. Yeah** . . . .
> Q. Have you taught your human trafficking investigations in massage parlors to nonsworn personnel **outside of San Francisco?**
> A. Well, if you talk about -- well, no. Strike that. **No. But if I can just add. So if we're at a conference, I really don't know if that person is not they're not solely based not in San Francisco. There could be other individuals like the Coalition to End Human Trafficking from Santa Clara, the Santa Clara Coalition to End Human Trafficking. So we could have other individuals that are inside the audience. I just wouldn't know if they were all San Francisco based or not.** Hopefully that makes sense.
> Q. Okay. But as you sit here today you don't have knowledge of anyone specifically that you have taught that is nonsworn that you've taught your human trafficking massage parlor course to. Is that correct?
> A. No.

Flores Dep. 23:21–25:5.  And Defendants' representation that Flores never received instruction on supervision of code inspectors in massage businesses is also taken out of context.  During this portion of his deposition, counsel asked only about whether his "*Massage Therapy Council training courses*" taught any methodologies for supervising code enforcement inspectors in massage businesses.  Flores Dep. 28:2–8.  But Flores's report lists twelve other courses he has taken, and he testified that some of these courses also involved code enforcement: "the vice section from LAPD and also in the POST human trafficking course."  Flores Dep. 16:2–24.

### b.     Reliability

Next, Defendants argue that Flores lacks reliable support for his opinion that sexual assault or extortion is the likely outcome of a solo male code inspector working in massage businesses. Defendants contend that Flores testified he was not aware of any other instance in his experience in which a code enforcement inspector assaulted or extorted a massage business worker; he is not aware of any standards applicable to supervising code inspectors; he is not aware of any

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ

jurisdiction that actually supervises code enforcement inspectors the way he opines they should be supervised; and he could not point to any written standards that suggest re-assigning an employee about whom a complaint has been made.

Defendants' arguments here are similarly unpersuasive.  First, whether similar conduct has occurred in the past is not necessarily relevant to the theory of Plaintiff's case—that the risks of exploitation were so obvious and well-known in the industry that the City did not need a pattern of similar instances to be on constructive notice.  *See* Order Den. Third Mot. to Dismiss 12–13. Second, Flores's lack of experience in code enforcement supervision could foreseeably render some opinions on code enforcement inadmissible, but it does not render his entire testimony unreliable.[6]  Flores still sufficiently explains how he formed his opinions on code enforcement best practices based on his observations, trainings, and teachings conducted over forty-three years in the SFPD overseeing code enforcement inspections in massage businesses—including observations of employees vulnerable to exploitation, power dynamics, intimate spaces, and code enforcement investigators' use of police powers.  Third, as the Court noted above, written standards on re-assigning code inspectors after receiving complaints is unnecessary to forming a reliable opinion.  The Court finds Flores may rely "solely or primarily on experience" because he has sufficiently explained how his experiences have led to his conclusions on code enforcement best practices in massage businesses, why that experience is a sufficient basis for his opinions, and how his experience is reliably applied to the facts of this case.  Fed. R. Evid. 702, advisory committee notes to 2000 amendments (citing *Daubert*, 43 F.3d at 1319).

### c.      Common Sense

Finally, Defendants also argue that Flores's opinions are no more than "common sense." But upon review of the cited potions of Flores's testimony, it appears Flores's use of "common sense" referred to "common sense" among industry professionals:

---

[6] Defendants have not moved to strike specific portions of Flores's opinion, but rather, requests exclusion of Flores entirely.  Defendants may raise more specific objections in motions in limine or during trial.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
18

United States District Court
Northern District of California

**Q. And what law enforcement agencies do you have knowledge of that follow this practice for law enforcement?**
**A. I think from my 44 years of law enforcement working with other individuals that work human trafficking cases.** I've talked to other colleagues about this particular case, and I get the same look. I get the same reaction from them. You know, "Are you serious? They're sending a lone man inside these places?" So just because it's not written, it literally comes down to **common sense**. And that individual going inside there by themselves, you're just -- there's problems. There's definitely problems when you're doing these type of operations.

Flores Dep. 77:16–78:4 (emphasis added).  Upon reviewing Flores's report and testimony in its entirety, the Court is satisfied that his opinions are based on his relevant experience, including experience conducting massage business inspections, rather than on the common sense available to any lay person.

Accordingly, the Court also finds that Flores is qualified as an expert by his knowledge, skill, experience, training, and education in the field of massage business inspections.  Plaintiff has also sufficiently demonstrated it is more likely than not that Powell's expertise will help the jury understand the evidence and determine the issue of deliberate indifference; that his testimony is based on sufficient knowledge of the industry; that his testimony is the product of reliable principles; and that his opinion reflects a reliable application of these principles to the facts of this case.

The Court therefore **DENIES** Defendants' motion to exclude Flores's expert testimony.

### 3.    Greene

Unlike Powell and Flores, Plaintiff does not challenge the admissibility of Greene's opinions under Rule 702.  Instead, Plaintiff seeks to exclude Defendants' rebuttal expert on procedural grounds under Federal Rule of Civil Procedure 26.

Rule 26 generally outlines the rules for expert disclosures and defines a rebuttal expert as one who "is intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  Plaintiff argues that Greene should be excluded because he was mischaracterized as a "rebuttal" expert—posturing that Defendants actually intended on using him as an initial expert, but they missed the deadline.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
19

Defendants first disclosed Greene during fact discovery on August 19, 2025, as the person who would conduct a psychiatric independent medical examination ("IME") on Plaintiff. Greene conducted his IME in August, but Plaintiff never saw his report. Weeks later, Plaintiff disclosed her initial expert Dr. Ponton. And about one month later, after the deadline for initial expert disclosures had past, Defendants disclosed Greene as a "rebuttal" psychiatric expert on September 30, 2025. They characterize Greene as rebutting Ponton's opinions on damages—specifically, Greene opines that Plaintiff's psychiatric health injuries do not require the length and degree of care opined by Ponton. But in support of his rebuttal, Greene uses findings from the IME he conducted prior to Ponton's report. Plaintiff argues Greene's opinion must therefore be excluded because Greene is not a "rebuttal" expert, but rather an initial expert, and he should have been disclosed as such prior to the deadline for initial expert disclosure on September 22, 2025. In other words, because he did not conduct his IME *in response* to Ponton's report, his opinion was never intended solely to contradict or rebut the evidence in that report.

The Court agrees with Plaintiff that the timing of the IME and Greene's report is unusual. However, Plaintiff has not provided any authority prohibiting the use of prior findings to rebut the opinion of an initial expert during trial. So long as Greene's testimony only uses his IME findings to narrowly contradict or rebut Ponton's opinions on the same subject matter, the Court sees no reason for exclusion. Plaintiff may of course cross-examine Greene on the timing of his report and raise additional objections regarding specific portions of Greene's proffered testimony in motions in limine or at trial.

The Court therefore **DENIES** Plaintiff's motion to exclude Greene's expert testimony.

### B.    Motion for Summary Judgement

The Court finds genuine issues of material fact preclude summary judgment in the City's favor, but claims against Supervisor Defendants are deficient as a matter of law.

#### 1.    The City

To succeed in her *Monell* claims against the City, Plaintiff must show that the City (1) caused her injuries through a policy, custom, or practice (2) which was adhered to with deliberate

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
20

indifference to her constitutional rights.  *See* Third MTD Order (describing Plaintiff's theory of liability); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  The City raises arguments relevant to both requirements.

### a.    Policy, Custom, or Practice that Caused Plaintiff's Injury

There are two policies, customs, or practices that Plaintiff argues caused her injuries.  First, Plaintiff identifies the practice of sending solo male code enforcers to inspect massage businesses unsupervised.  Second, Plaintiff identifies the fragmented reporting and supervision policy that allowed Gerry's conduct to continue despite the City receiving several complaints of similar misconduct.  The City does not dispute that the first is a "practice" and the second is a "policy" for purposes of *Monell* liability.  The City does, however, contend that there is no evidence this practice or policy was the proximate or but-for cause of Plaintiff's injury.

The Court disagrees.  Regarding proximate causation, the City cites to inapposite case law.  For example, the City relies on a case where a police officer committed a robbery and assault as a civilian off duty.  *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).  The Ninth Circuit there held that, despite the officer's extensive disciplinary record at work, the county "could not reasonably have foreseen that [the deputy] would become a free-lance criminal and attack the Van Orts as he did," and his "unforeseeable private acts broke the chain of proximate cause connecting the County."  *Id.*  But here, Gerry was not a "free-lance criminal" who could have committed his crimes regardless of his position.  Instead, the evidence shows Gerry abused his power as a City employee while on duty, wearing a uniform and a badge, and driving a City vehicle, and he used his position in the City to coerce Plaintiff to comply with his demands.  There are simply no breaks in the causal chain similar to those in *Van Ort*.[7]

Regarding but-for causation, the City summarily argues that even if Gerry were supervised, there is no *guarantee* that he would not have returned to rape and extort Plaintiff while off duty.  But the City provides no support for its representation that Plaintiff must guarantee such

---

[7] The Court notes that the question of foreseeability is also discussed in the deliberate indifference section below.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
21

a hypothetical would not occur. The evidence here is that Gerry raped and extorted Plaintiff under the color of law. A reasonable jury could find under these circumstances that Plaintiff's injuries would not have occurred but for the City's practice and policy that provided Gerry with the authority and lack of oversight necessary to abuse Plaintiff.

### b.    Deliberate Indifference

Next, to show deliberate indifference, Plaintiff must demonstrate the City "was on actual or constructive notice" that its failure to prevent unsupervised solo made code enforcement inspections, or its fragmented reporting and supervision policy, would likely result in the constitutional violations alleged here. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012). This is an objective inquiry. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

The Court finds the City's arguments here similarly unpersuasive. First, the City appears to re-raise legal arguments the Court disposed of in its Third MTD Order. Namely, the City argues it cannot be held liable for failing to train Gerry to not rape and extort Plaintiff, and it cites to failure-to-train cases holding as much. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013); *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998). While this is correct under *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1156 (9th Cir. 2014), as the Court noted in its Third MTD Order, this is not the theory of Plaintiff's case. Plaintiff alleges the City failed to ensure proper *supervision* of code inspectors in an environment ripe for abuse, not that the City failed to train inspectors to not break the law. As the Court previously noted:

> Defendants argue that the conclusory opinions of experts about the adequacy of San Jose's code enforcement practices are irrelevant when the Ninth Circuit in *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1156 (9th Cir. 2014), has held that a municipality is not deliberately indifferent for failing to train and supervise employees not to do what criminal law forbids . . . . The plaintiff in *Flores* alleged that the municipality was deliberately indifferent for failing to give their deputies "specific instruction not to commit sexual assault," *id.* at 1160; here, Plaintiff now alleges facts to show that the City was deliberately indifferent for implementing a custom or practice that allowed solo male code enforcers to inspect massage businesses unsupervised and with unfettered power, where it was common knowledge among law enforcement agencies that such policies would

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
22

United States District Court
Northern District of California

likely result in constitutional violations, and where it received prior complaints that should have specifically alerted them to Gerry's constitutional violations. Despite the notion that everyone is "presumed to know the law," and the City can in some degree rely on the criminal justice system to deter criminal conduct, the City still has the responsibility to ensure that its customs and practices are not creating the optimal conditions under which unconstitutional conduct is likely to occur.

Third MTD Order 14, 16. Plaintiff highlighted this misdirection, but the City did not address it in their Reply and has provided the Court no reason to find otherwise here.

Next, the City focuses on the fact that there is no evidence of any similar prior incidents involving other employees that would put the City on notice of the likelihood of harm, but also as discussed in the Third MTD Order, that is not required, and it is not the theory of Plaintiff's case. Although notice is ordinarily shown through demonstrating a pattern of similar constitutional violations by employees, "evidence of a pattern of constitutional violations is not always required to succeed on a *Monell* claim." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011). "[I]n a narrow range of circumstances" a particular "showing of 'obviousness' can substitute for the pattern of violations ordinarily necessary to establish" deliberate indifference. *Kirkpatrick*, 843 F.3d at 794 (citing *Connick*, 563 U.S. at 63). For example, the Ninth Circuit stated that "a single incident of excessive force, coupled with evidence that a city had neglected to train its armed officers on the constitutional limitations on using force against fleeing felons, might establish that the city manifested deliberate indifference in training law enforcement." *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989)). Here, as the Court previously found, despite there being "no facts regarding a pattern of violations," Plaintiff's theory is that "the City's custom or practice of sending unsupervised solo male code enforcement inspectors into massage businesses presents an 'obvious risk' of constitutional violations." Third MTD Order 13. The City's arguments regarding a pattern of similar conduct are therefore irrelevant.

Finally, the City notes that the standards described by Plaintiff's experts were not mandatory written procedures the City *had* to follow, but it failed to provide support for its theory that only mandatory procedures can be used as evidence for deliberate indifference.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
23

Accordingly, the Court finds the City has failed to show that undisputed facts establish no deliberate indifference as a matter of law. Indeed, the Court identifies many disputed facts that a jury might consider to find the City deliberately indifferent when viewed in the light most favorable to Plaintiff. Plaintiff has introduced evidence that the City decided to enact a practice of sending solo male code enforcers with substantial discretion and power into massage businesses unsupervised, despite the well-known risk in the code enforcement industry that such a practice creates an obvious opportunity for abuse. And while Gerry was in the field, he conducted roughly 700 code inspections of massage businesses in the span of eighteen months, only two of which he was accompanied by a supervisor. Against this backdrop of obvious risk and a lack of supervision, the City then received several reports of Gerry's serious misconduct. Though some reports are subject to interpretation, when drawing all reasonable inferences in Plaintiff's favor, a jury could find that they provided the City repeated notice that Gerry was committing sexual misconduct and extortion during his inspections. And importantly, several of these reports were never communicated to Gerry's supervisors, Hatfield and Roberts, who expressed shock during their depositions and testified that they wish they had known sooner so they could have prevented this from happening. Taken together, the evidence could show that the City implemented and carried out its practice and policy in deliberate indifference to Plaintiff's constitutional rights. *See Harris*, 489 U.S. at 389–99; *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014); *Bode v. City of Fullerton*, 815 F. Supp. 2d 1117 (C.D. Cal. 2011) (finding that when an officer is assigned to interact with vulnerable women in settings that lend themselves to coercion, and when the municipality receives warnings consistent with later misconduct yet leaves the officer in the same public-facing role, a jury may find deliberate indifference).

It is true, as the City contends, that it has its own side to this story. It has explanations for how each report was investigated and why they did not result in Gerry's removal from the field. It also has arguments to impeach the opinions of Plaintiff's experts who opine on the obvious risk inherent in sending solo male code inspectors into massage businesses unsupervised. But these arguments merely highlight the inappropriateness of this issue for summary judgment. A jury, not

the Court, must weigh these facts, and despite the City's explanations and arguments, it remains that a reasonable jury could interpret the evidence in Plaintiff's favor and find the City deliberately indifferent.

### c.    Due Process Clause

Before moving to its discussion concerning Supervisor Defendants, the Court notes the City's remaining arguments regarding Plaintiff's right to due process.[8]

The City generally contends that Plaintiff's due process claim fails because there is no protected property interest in operating an unpermitted business.  But Plaintiff explains in response that the property interest alleged here is actually interest in the good will of her business and the $34,000 that Gerry extorted from her.  As Plaintiff highlights, the Ninth Circuit has recognized this property interest in good will under California law in *WMX Techs., Inc. v. Miller*, providing:

> The California Business & Professions Code, § 14100, provides the good will of a business is the expectation of continued public patronage . . . .  Essentially, the goodwill of a business is its value as a going concern and is made up of many factors, such as location, patronage of customers, relations with suppliers, experience of employees, effectiveness of management, and many other factors.

197 F.3d 367, 374 (9th Cir. 1999).  Plaintiff also cites to a Seventh Circuit case finding that monetary extortion could give rise to a due process claim against supervisors.  *Roach v. City of Evansville*, 111 F.3d 544, 550–51 (7th Cir. 1997) ("We agree with the district court that had the extortion been completed, Roach might have a due process claim that he could bring against Whitlow pursuant to Section 1983.").

The City largely drops this argument in the reply, except to contend that there is no evidence Gerry's actions impacted the good will of Plaintiff's business.  But this is directly contradicted by the evidence.  Plaintiff represents that she made payments to Gerry totaling $34,000 under the belief that he would use that money to acquire a business permit; but when she

---

[8] Defendants also raise arguments regarding Plaintiff's equal protection claim that are relevant only to Supervisor Defendants.

United States District Court
Northern District of California

reported Gerry to the City and discovered this was not the case, the City nevertheless responded by shutting down her business for operating without a permit.  A reasonable jury could find under these circumstances that Gerry's conduct interfered with Plaintiff's expectation of continued public patronage.

Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to the City.

### 2.    Supervisor Defendants

Supervisors may generally be liable under Section 1983 if they are deliberately indifferent in supervising their subordinates and deliberately indifferent to the consequences of their subordinates' behavior.  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011); *L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996).  Deliberate indifference is shown by (1) the supervisor's "actual knowledge of, or willful[] ignore[ance] to" serious risk of harm and (2) the supervisor's failure to "take obvious steps to address that known, serious risk."  *Grubbs*, 92 F.3d at 900 (quoting *Manarite By & Through Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992)); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (supervisors also liable where they "refused to terminate a series of acts by others").  Liability under this standard is found where supervisors acquiesce to the constitutional violations of their subordinates either following a complaint or as a result of their own culpable inaction in the supervision or control of subordinates—even in the absence of overt personal participation in the constitutional violation.  *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022); *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).  Such deliberate indifference must also be causally related to the constitutional violation, which in turn may be established through evidence that the supervisor knowingly refused to terminate a series of actions which the supervisor knew or reasonably should have known would lead to a constitutional violation.  *Starr*, 652 F.3d at 1207–08.

Here, the relevant inquiry is whether Supervisor Defendants knew of the serious risk of sexual assault and extortion posed by Gerry; and if so, whether they failed to take obvious steps to

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
26

United States District Court
Northern District of California

address that risk in a way that constituted willful blindness.

The Court answers both questions in the negative. First, the Court finds the information available to Supervisor Defendants was insufficient to put them on notice of Gerry's sexual misconduct and extortion. As discussed above, the Code Enforcement Office received only two reports regarding Gerry: (1) the vehicle report and (2) the handwritten letters. The vehicle report does not reveal any sexual misconduct or extortion; the report merely indicates that Gerry's car was parked outside of a massage business for a long period of time, which is an ordinary occurrence in his occupation. And the Court already found in prior orders that the contents in the anonymous letters "alluding to an improper intimate relationship between Gerry and a massage business owner were not enough [on their own] to put Roberts on notice that Gerry would sexually assault and bribe massage business owners." Third MTD Order 21. Accordingly, without the benefit of also receiving the Moore report and OER Whistleblower Hotline complaint, the Court finds Supervisor Defendants could not have known of the serious risk of sexual assault and extortion posed by Gerry. *See Grubbs*, 92 F.3d at 900 (distinguishing deliberate indifference from gross negligence and holding deliberate indifference requires that "the defendant knows that something *is* going to happen but ignores the risk and exposes someone to it") (emphasis in original).

Second, even if Supervisor Defendants knew about the risk of serious harm, they took *some* action in response. Roberts questioned Gerry about the report of a suspicious vehicle and the handwritten letters. Roberts also instructed Gerry to not return to the businesses implicated in the letters and forwarded the letters to SJPD. It is true that Supervisor Defendants could have, and perhaps should have, done more to supervise Gerry given the nature of these letters; but at a minimum, these actions go beyond the willful blindness required to show deliberate indifference. *See, e.g., Patel*, 648 F.3d at 974–75.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ

United States District Court
Northern District of California

The Court therefore finds the evidence in the record, when viewed in the light most favorable to Plaintiff, is insufficient to establish that Supervisor Defendants acted with deliberate indifference.  For that reason, the Court **GRANTS** Defendants' motion for summary judgment as to Supervisor Defendants.[9]

## IV.    CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' motion to strike Powell and Flores; **DENIES** Plaintiff's motion to strike Greene; **DENIES** Defendants' motion for summary judgment as to the City; and **GRANTS** Defendants' motion for summary judgment as to Supervisor Defendants.

**IT IS SO ORDERED.**

Dated: January 22, 2026

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

---

[9] The Court need not reach the remaining arguments regarding qualified immunity and Plaintiff's due process and equal protection claims.

Case No.: 5:21-cv-00092-EJD
ORDER DEN. MOTS. TO STRIKE; GRANTING IN PART AND DEN. IN PART MSJ
28